*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 11a0178p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

———————————

WARREN K. HENNESS,

> *Petitioner-Appellant,*

> *v.*

No. 07-4479

MARGARET BAGLEY, Warden,

> *Respondent-Appellee.*

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 01-00043—Michael R. Merz, Magistrate Judge.

Argued: December 8, 2010

Decided and Filed: July 6, 2011

Before: BOGGS, SILER, and SUTTON, Circuit Judges.

———————————

**COUNSEL**

**ARGUED:** Vincent P. Popp, POPP & TUSS, Dayton, Ohio, for Appellant. Seth Kestner, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** Vincent P. Popp, Mark A. Tuss, POPP & TUSS, Dayton, Ohio, for Appellant. Seth Kestner, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

———————————

**OPINION**

———————————

SILER, Circuit Judge. Warren K. Henness was sentenced to death for aggravated murder. He appeals the district court's dismissal of his 28 U.S.C. § 2254 habeas petition, which alleges numerous violations of his constitutional rights.

The district court granted Henness a certificate of appealability ("COA") for eight claims, and we granted a COA on three additional issues. We therefore review

1

eleven claims on appeal, alleging: (1) trial counsel rendered ineffective assistance by failing to file a motion to suppress the fruits of an illegal stop and arrest at the time Henness was arrested; (2) the trial court should have granted the motion to suppress statements that Henness made to the police; (3) trial counsel rendered ineffective assistance during the mitigation phase; (4) the State improperly withheld *Brady* material; (5) the trial court improperly held Tabatha Henness competent to testify; (6) the trial court improperly permitted a coroner to testify on a matter outside his field of expertise; (7) the trial court improperly refused to allow Henness's counsel to withdraw prior to the sentencing phase; (8) appellate counsel rendered ineffective assistance by failing to raise several issues on direct appeal; (9) the trial court improperly admitted the testimony of Robert Curtis; (10) the trial court improperly permitted the prosecutor to lead Curtis's testimony and allowed Curtis to engage in improper speculation; and (11) the court erroneously instructed the jury during the sentencing phase.

For the following reasons, we **AFFIRM** the district court's denial of the writ.

## I. FACTS

Henness was convicted of aggravated murder with specifications and sentenced to death for killing Richard Myers, a fifty-one-year-old laboratory technician from Circleville, Ohio.[1] On the morning of March 20, 1992, Myers told his wife that he had something to do before he reported to work at midnight. Although he did not elaborate, his wife knew that he was an Alcoholics Anonymous volunteer and frequently traveled to Columbus to counsel others about drug and alcohol addictions. When his wife returned home from work that afternoon, Myers was not there. He also failed to report to work that evening.

That same morning, Henness's wife, Tabatha, answered a telephone call at Robert Curtis's residence, where she and Henness were staying. The caller identified himself as "Dick" and asked for Henness. After the phone conversation ended, Henness

---

[1]These facts are taken from the Ohio Supreme Court's findings on direct appeal. *See State v. Henness*, 679 N.E.2d 686, 689-91 (Ohio 1997).

told Tabatha he was going out. A car subsequently arrived for him. Tabatha recognized the driver as "Dick," a man who had picked up Henness several other times in the same vehicle.

A few hours later, Henness returned to the residence to pick up Tabatha. He was alone and driving Myers's car. The couple drove to a carwash and smoked crack. In his possession, Henness had checks and credit cards belonging to Myers. Tabatha suggested that they contact Roland Fair, a drug dealer acquaintance, to pose as Myers to "po[p] the checks" and "play on the credit cards."

The next day, Henness and Tabatha drove to Fair's apartment. Henness told Fair that the owner of the checks, credit cards, and car was in a motel room with two prostitutes who were keeping him drunk. While at Fair's apartment, Tabatha saw Henness washing a knife in the bathroom sink. Later, Fair noticed the knife soaking in the sink. The knife had a dark stain on it. Henness told Fair that it was his knife.

Henness, Tabatha, and Fair traveled to several banks and check-cashing outlets for two days, uttering forged checks and getting cash advances with the credit cards. They used the money to buy drugs. They also used the credit cards to buy merchandise, which they then sold for more drugs.

At some point during this activity, Tabatha suggested that Henness tell Fair the truth about Myers. According to Tabatha, Henness told Fair that the owner of the car, checks, and credit cards had pulled a gun on him, Henness shot him, "and the guy died." According to Fair, Henness never specifically said what he did to Myers, but he did say, "I did not want to do it. He made me do it." Later, Henness told Fair that the body was in the Nelson Road area in Columbus. The trio discussed possible ways to dispose of it.

A few days later, Tabatha saw Henness with a gold wedding ring that was too big for him. Henness told her it was Myers's ring. Henness also sold Myers's car to a sixteen-year-old drug dealer for $250. Henness forged a bill of sale and signed it "Richard Myers." The following day, the police recovered the car and impounded it

because its owner was reported missing. The police questioned the sixteen-year-old, who told them about Henness.

On March 25, the police received an anonymous telephone call alerting them to the body of a dead man in an abandoned water purification plant. There, police discovered the body of Myers. His shoe laces were tied together, his mouth was gagged, and his hands were bound together behind his back with a coat hanger. They found four shell casings and one live round near his body. The four casings were all ejected from the same weapon. Myers had been shot five times in the head. One bullet had penetrated his brain, killing him. He had a large cut on his neck. Abrasions on his knees showed that his knees had struck a hard surface, and were consistent with being forced to kneel on a concrete floor. Myers's left ring finger had been severed six to eight hours after death.

Columbus police arrested Henness on an unrelated charge. Because he was also a suspect in Myers's murder, homicide detectives questioned him. During the interrogation, Henness claimed Fair approached him with the checks and credit cards, and suggested that Fair may have committed the murder. Henness also told detectives he had not owned a gun since 1990. However, Tabatha and Curtis testified that Henness had a handgun that he sold to a drug dealer about two weeks after Myers's murder.

Henness was later interrogated for a second time. He admitted he was with Myers on March 20, and Myers was helping him seek drug counseling and treatment for Tabatha. He also admitted that Fair was not involved in the murder. Instead, he blamed the murder on some Cubans who were trying to settle a score with him. He stated Myers happened to be at the wrong place at the wrong time.

## II.  PROCEDURAL HISTORY

Henness was indicted in Ohio on three counts of aggravated murder: (1) murder with prior calculation and design; (2) aggravated robbery-murder; and (3) kidnap-murder. He was also charged with aggravated robbery, kidnapping, forgery, and having a weapon while under disability. He pleaded guilty to the forgery counts and elected to

try the weapon charge before the trial court, which found him guilty. A jury convicted him of the remaining counts and recommended a death sentence. The trial court adopted the jury's recommendation and sentenced Henness to death. On direct appeal, the Ohio Court of Appeals affirmed Henness's convictions and sentence of death. *State v. Henness*, No. 94APA02-240, 1996 WL 52890 (Ohio App. Feb. 6, 1996) (unpublished). The Ohio Supreme Court also affirmed. *Henness*, 679 N.E.2d at 700.

In 1996, Henness filed a state post-conviction petition, which the trial court denied. The Ohio Court of Appeals affirmed the trial court's denial of his petition. *State v. Henness*, No. 97APA04-465, 1999 WL 739588 (Ohio App. Sept. 23, 1999) (unpublished). The Ohio Supreme Court denied Henness permission to further appeal this decision.

In 2001, Henness's counsel filed a motion to reopen his direct appeal under Ohio App. R. 26(B) with the Ohio Court of Appeals. Henness also filed a pro se Rule 26(B) motion. The court denied both motions because Henness had not established good cause for his failure to timely file the motions. Although Henness attempted to appeal this decision to the Ohio Supreme Court, the court rejected his appeal as untimely.

In 2001, Henness also filed a § 2254 petition in federal court, alleging numerous violations of his constitutional rights. The district court subsequently dismissed his petition as meritless. *Henness v. Bagley*, No. 2:01-cv-043, 2007 WL 3284930 (S.D. Ohio Oct. 31, 2007).

## III. STANDARD OF REVIEW

We review a district court's dismissal of a § 2254 petition de novo. *Garcia v. Andrews*, 488 F.3d 370, 373 (6th Cir. 2007). We review the court's factual findings for clear error. *Hill v. Hofbauer*, 337 F.3d 706, 710 (6th Cir. 2003). Because Henness filed his petition for a writ of habeas corpus after the effective date of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), that statute governs our review of this case. Under AEDPA, the district court may not grant a habeas petition with respect to any claim that was adjudicated on the merits in the state courts unless the adjudication

resulted in a decision that (1) was contrary to, or involved an unreasonable application of, clearly established federal law; or (2) was based on an unreasonable determination of the facts in light of the evidence presented to the state courts. 28 U.S.C. § 2254(d).

**IV.**

**A.     Ineffective Assistance of Trial and Appellate Counsel**

Henness argues that his trial counsel rendered ineffective assistance by failing to file a motion to suppress the fruits of an illegal stop and arrest. Because the Ohio Supreme Court did not rule on the merits of this claim, AEDPA deference does not apply and we review the claim de novo. *See Hawkins v. Coyle*, 547 F.3d 540, 546 (6th Cir. 2008).

As an initial matter, Henness failed to raise this argument in his direct appeal and he therefore procedurally defaulted the claim. *See Gray v. Netherland*, 518 U.S. 152, 161-62 (1996); *Pudelski v. Wilson*, 576 F.3d 595, 605 (6th Cir. 2009). He may, nevertheless, obtain federal habeas review of the claim if he can demonstrate cause and prejudice to excuse his default. *Gray*, 518 U.S. at 162; *Tolliver v. Sheets*, 594 F.3d 900, 928 (6th Cir. 2010). Henness argues that cause to excuse his procedural default exists because his appellate counsel failed to raise the ineffective assistance of trial counsel claim on direct appeal. For ineffective assistance of appellate counsel to serve as cause, the petitioner must first have properly presented the claim of ineffective assistance of appellate counsel to the state courts, so that this claim also is not procedurally defaulted. *Edwards v. Carpenter*, 529 U.S. 446, 450-51 (2000).

Henness failed to timely raise his ineffective assistance of appellate counsel claim. He first raised the claim in a motion to reopen his appeal filed under Ohio R. App. P. 26(B), which was filed several years beyond the 90-day deadline provided under Rule 26(B). The Ohio Court of Appeals denied the motion as untimely. Henness had 45 days to appeal this decision to the Ohio Supreme Court under Ohio Sup. Ct. Prac. R. II(2)(A)(1), but he also failed to timely file this appeal.

Regardless of the procedural default issues, Henness's ineffective assistance of appellate counsel claim fails on the merits. Although appellate counsel has no obligation to raise every possible claim and the decision on which claims to raise is ordinarily entrusted to counsel's professional judgment, the failure of counsel to raise a meritorious issue can amount to constitutionally ineffective assistance. *McFarland v. Yukins*, 356 F.3d 688, 710 (6th Cir. 2004). To evaluate a claim of ineffective assistance of appellate counsel, then, the court must assess the strength of the claim that counsel failed to raise. *Wilson v. Parker*, 515 F.3d 682, 707 (6th Cir. 2008). Counsel's failure to raise an issue on appeal amounts to ineffective assistance only if a reasonable probability exists that inclusion of the issue would have changed the result of the appeal. *Id.* If a reasonable probability exists that the defendant would have prevailed had the claim been raised on appeal, the court still must consider whether the claim's merit was so compelling that the failure to raise it amounted to ineffective assistance of appellate counsel. *Id.*

As the basis for his underlying claim, Henness asserts that his trial counsel rendered ineffective assistance by not filing the motion to suppress. To prevail on an ineffective assistance of counsel claim, he must show that his counsel's performance was deficient and that he suffered prejudice as a result of the deficient performance. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "Where defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice." *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986).

We therefore turn to the merits of Henness's Fourth Amendment claim. Columbus Police Officer James Gravett arrested Henness based on a tip by an unnamed person. Specifically, an unidentified individual approached Officer Gravett on the street and told him that a white male in a green trench coat had just threatened to shoot him. When Officer Gravett proceeded in the direction of the alleged incident, he spotted a white male in a green trench coat walking toward him. This individual would later be

identified as Henness.  Officer Gravett stopped him and patted him down, finding a knife in his coat pocket.  He then arrested him.  While in custody, Henness made incriminating statements.

Henness argues that the information provided by the unidentified individual did not provide a sufficient basis for Officer Gravett to stop and search him under *Terry v. Ohio*, 392 U.S. 1 (1968).  He compares the tip in this case to the anonymous tip in *Northrop v. Trippett*, 265 F.3d 372 (6th Cir. 2001).  In *Northrop*, an anonymous telephone caller informed the Detroit Police Department that two black males wearing a particular brand of clothing were selling drugs at a bus station.  *Id.* at 375-76.  We determined that this type of anonymous tip did not bear sufficient indicia of reliability, as the officers knew nothing about the informant and the tip did not provide predictive information to allow the officers to assess its reliability.  *Id.* at 382.

There is a difference, however, between anonymous tips provided over the telephone and those given face-to-face with a police officer.  An in-person tip gives the officer an opportunity to observe the informant's demeanor and credibility.  *See United States v. Palos-Marquez*, 591 F.3d 1272, 1275 (9th Cir. 2010); *United States v. Griffin*, 589 F.3d 148, 152 (4th Cir. 2009); *United States v. Heard*, 367 F.3d 1275, 1279 (11th Cir. 2004); *United States v. Romain*, 393 F.3d 63, 73 (1st Cir. 2004).  The in-person informant risks being held accountable for false information.  *Palos-Marquez*, 591 F.3d at 1275; *Griffin*, 589 F.3d at 152; *Romain*, 393 F.3d at 73.  Additionally, an in-person informant's proximity in time and space to the reported criminal activity indicates the reliability of the tip, because it reflects that the informant acquired the information firsthand.  *See United States v. Chapman*, 305 F.3d 530, 534 (6th Cir. 2002).

In *United States v. Allen*, 211 F.3d 970 (6th Cir. 2000) (en banc), a confidential informant provided information to a detective, who used the information in an affidavit for a search warrant against the defendant.  The informant was not anonymous, but personally known to the detective and disclosed to the magistrate.  *Id.* at 976.  The informant's tip "was of direct personal observation of criminal activity," observed in the

recent past. *Id.* Under these facts, we held the information was sufficiently reliable in spite of the fact that the informant remained unnamed. *Id.*

Accordingly, Officer Gravett did not violate Henness's Fourth Amendment rights. An officer may rely on a complaint made by an individual whose name the officer does not know, but who made the complaint in open view of the officer. This case is fundamentally different from *Northrop*, because "[u]nlike a faceless telephone communication from out of the blue, a face-to-face encounter can afford police the ability to assess many of the elements that are relevant to determining whether information is sufficiently reliable to warrant police action." *Romain*, 393 F.3d at 73. Officer Gravett had an opportunity to observe the individual's behavior and assess the individual's veracity. The individual reported information concerning criminal activity that had recently occurred in the vicinity. Since Officer Gravett knew the physical appearance and location of the individual, the individual risked being held accountable for providing false information. Based on this information, Officer Gravett had authority under *Terry* to stop Henness with reasonable suspicion that a crime had been committed, and to pat down Henness with reasonable suspicion that he was armed.

Because Henness has not demonstrated that his Fourth Amendment claim has merit, his underlying ineffective assistance of trial counsel claim fails, along with the ineffective assistance of appellate counsel claim. *See Kimmelman*, 477 U.S. at 375; *Wilson*, 515 F.3d at 707.

**B.      Failure to Suppress Henness's Statements to the Police**

Henness contends that the police obtained a statement from him in violation of his Fifth Amendment rights. Because he raised this claim on direct appeal, there is no procedural default issue. The state court reached the merits and AEDPA deference applies. *See Schriro v. Landrigan*, 550 U.S. 465, 474 (2007).

When detectives first interviewed Henness, they advised him of his rights, and he executed a standard waiver form. They questioned him about forgeries of checks and credit cards belonging to Myers. For three hours, Henness freely answered questions.

When the detectives began to question him about the murder, however, Henness stated, "I think I need a lawyer because if I tell everything I know, how do I know I'm not going to wind up with a complicity charge?" A detective responded, "If you don't talk to us, you're going to get a lot more than a complicity charge." At that time, the detectives terminated the interview.

While incarcerated after his arrest, Henness periodically made phone calls to a friend, Teresa Thomas. Thomas recorded the conversations and provided them to police. During one of these conversations, Henness stated that, if "detectives would come and see [me], [I] would tell them all about it." Based on this statement, detectives interviewed Henness a second time. Prior to the interview, the police gave Henness *Miranda* warnings and Henness waived his constitutional rights. He then acknowledged that Fair was not involved in Myers's murders, as Henness had previously indicated. Henness also admitted being with Myers on the day of his death, but claimed that a group of Cubans were to blame for the murder. He suggested that the Cubans targeted Henness to settle a drug score, but killed Myers instead.

The Ohio Supreme Court found that Henness's statement, "I think I need a lawyer," was not an unambiguous request for counsel. It found the statement similar to the one in *Davis v. United States*, 512 U.S. 452, 455 (1994), and held that the first written waiver remained effective when the officers resumed their interrogation of Henness six days later. The court did not rule on the question of whether the second interrogation was initiated by Henness.

Henness challenges the Ohio Supreme Court's conclusion, and maintains that his statement to police was a clear invocation of his right to counsel. He argues that he terminated the first interview by making that request, and did not reinitiate the second interview during his telephone conversations with Thomas.

The decision in *Edwards v. Arizona*, 451 U.S. 477, 482 (1981), requires the police to immediately cease questioning a suspect if he invokes the right to counsel at any time. However, "the suspect must unambiguously request counsel." *Davis*, 512 U.S. at 459. Thus, a suspect invoking his right to counsel during custodial interrogation

"must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.*

In *Davis*, the phrase, "Maybe I should talk to a lawyer," was not an unambiguous request for counsel. *Id.* at 462 ("[W]e are unwilling to create a third layer of prophylaxis to prevent police questioning when the suspect *might* want a lawyer."). Pursuant to *Davis*, the Fourth Circuit held that the statement, "I think I need a lawyer," was not an unequivocal request for counsel. *Burket v. Angelone*, 208 F.3d 172, 198 (4th Cir. 2000). The Ninth Circuit reached the same conclusion with the similar phrase, "I think I would like to talk to a lawyer." *Clark v. Murphy*, 331 F.3d 1062, 1069-72 (9th Cir. 2003). Under *Davis* and its progeny, the Ohio Supreme Court's conclusion that Henness failed to unambiguously invoke his right to counsel is not an unreasonable application of federal law. *See Landrigan*, 550 U.S. at 474.

Even if Henness's statement is construed as an unambiguous request for counsel, the police properly interrogated Henness because he reinitiated the conversation. An *Edwards* reinitiation occurs when, without influence by the authorities, the suspect shows a willingness and a desire to talk about his case. *United States v. Whaley*, 13 F.3d 963, 967 (6th Cir. 1994). In *Van Hook v. Anderson*, 488 F.3d 411 (6th Cir. 2007) (en banc), we examined how *Edwards* applies to third-party communications. We determined that a suspect's willingness to speak to the authorities is not restricted to direct communication only, and a suspect can "communicate a willingness and a desire to talk with police through a third person." *Id.* at 418; *see also Owens v. Bowersox*, 290 F.3d 960, 962 (8th Cir. 2002) (It was not "unreasonable for the state court to hold that a defendant may evince a willingness and desire to discuss the crime by communicating with the police through a third party, especially a close relative."); *United States v. Michaud*, 268 F.3d 728, 737-38 (9th Cir. 2001) (holding that officers had the right to inquire whether a suspect was reinitiating communication when her cell-mate told a deputy she wanted to talk); *United States v. Gonzalez*, 183 F.3d 1315, 1323-24 (11th Cir. 1999) (holding that the suspect initiated discussions with police through his wife).

Henness's statement to Thomas reflected a willingness to further discuss the case with the police. As a result, the officers did not violate Henness's Fifth Amendment rights by interviewing him a second time.[2]

## C.     The Mitigation Stage of Henness's Trial

Henness maintains that the mitigation phase of his trial was flawed because the trial court denied his counsel's motion to withdraw from the case and, as a result, counsel rendered ineffective assistance. These claims present no procedural default issue. Because the Ohio courts reached the merits, we apply AEDPA deference to the state courts' decision.

### i.     The Denial of Counsel's Motion to Withdraw

The Sixth Amendment requires that a defendant have a reasonable opportunity to employ counsel of his own choosing. *Chandler v. Fretag*, 348 U.S. 3, 10 (1954); *United States v. Sullivan*, 431 F.3d 976, 979 (6th Cir. 2005). However, this right is not absolute. *Sullivan*, 431 F.3d at 979; *United States v. Iles*, 906 F.2d 1122, 1130 (6th Cir. 1990). To substitute counsel during trial, the defendant must show good cause, such as "a conflict of interest, a complete breakdown in communication or an irreconcilable conflict with his attorney." *Sullivan*, 431 F.3d at 979-80.

When reviewing a trial court's denial of a motion to substitute counsel, we consider four factors:

> (1) the timeliness of the motion, (2) the adequacy of the court's inquiry into the matter, (3) the extent of the conflict between the attorney and client and whether it was so great that it resulted in a total lack of communication preventing an adequate defense, and (4) the balancing of these factors with the public's interest in the prompt and efficient administration of justice.

---

[2] At the district court, Henness claimed that the officers did not give him *Miranda* warnings before the second interview. He fails to raise this challenge on appeal.

*United States v. Vasquez*, 560 F.3d 461, 466 (6th Cir. 2009). If the defendant's motion would "necessitate a last-minute continuance, the trial judge's actions are entitled to extraordinary deference." *Id.* at 467.

A significant breakdown in communication and trust occurred between Henness and his counsel. During the pre-trial stage, Henness rejected his counsel's recommendation that he accept the prosecution's offer of a guilty plea with a non-capital sentence. The relationship continued to deteriorate during trial, as Henness frequently disagreed with trial strategy and accused counsel of violating attorney-client confidentiality. Lead counsel subsequently stated that he "never had any other client so difficult and so stressful" as Henness. Counsel repeatedly advised the trial court of the situation and the adverse impact on Henness's representation. By the time the jury rendered its guilty verdict, Henness was refusing to speak with counsel. Henness then refused to allow counsel to present evidence during the mitigation phase, and insisted on planning his own mitigation strategy, which he would not share with counsel.

Counsel then moved the trial court to allow them to withdraw, believing that their ability to effectively represent Henness was compromised. Counsel described the nature of the relationship and their inability to work with Henness. Henness expressed his disenchantment with counsel, his low opinion of their ability as lawyers, and his lack of trust in their willingness to work on his behalf. The trial court denied counsel's motion, noting that the situation appeared largely to be of Henness's own making and changing counsel at such a late stage would result in significant delay and additional expense.

Applying the relevant factors, the Ohio courts' denial of this claim was a reasonable application of constitutional law. First, Henness and his counsel did not move to withdraw until after the guilt phase of his trial, and changing counsel at that stage would have disrupted the proceedings. The difficulties began in the pretrial stage, but the relationship did not deteriorate to the point of requesting new counsel until late in the proceedings.

Second, the trial court conducted an adequate inquiry into the matter before denying the motion. The court heard from both attorneys and Henness, as well as the

prosecutor.  The court noted that Henness's concerns about a breach of attorney-client confidentiality appeared unfounded, that both attorneys were experienced and talented lawyers, and that the appointment of new counsel at such a late stage would be difficult because of the time needed to become familiar with the case.

The third factor weighs in Henness's favor, as a significant breakdown in his relationship with counsel did occur.  Counsel described representing Henness as "exhausting and difficult."  Following the guilty verdict, Henness refused to meet or cooperate with counsel.

Turning to the fourth and final factor, we must balance the previous three factors with the public's interest in the prompt and efficient administration of justice.  This balance appears to have been forefront in the trial court's decision.  The court noted that "it would be very difficult, if next to impossible, for a new set of counsel to become as totally familiar with this case."  Additionally, the court commented that much of the difficulty resulted from Henness's own refusal to cooperate with his counsel.  The court concluded that "nothing in the totality of these circumstances [] would cause this court at this date in this trial to further delay this proceeding at a great expense to the state, and great expense to the jurors, and great expense to the court, and at great expense to this defendant in delaying the further conclusion of this matter."

The court did not unreasonably apply constitutional law in denying the motion to withdraw. *See Vasquez*, 560 F.3d at 466-68.  It carefully evaluated Henness's motion, and reasoned that the situation appeared largely to be of Henness's own making.  It also found that changing counsel at such a late stage would result in significant delay and additional expense.  Moreover, the court determined that Henness would suffer, as it would be "very difficult, if next to impossible" for new attorneys to adequately prepare for the case at such a late stage in the proceedings.

### ii.     Ineffective Assistance of Counsel at Sentencing Stage

In a related argument, Henness argues that his counsel rendered ineffective assistance during the sentencing stage as a result of the denial of the motion to withdraw. To prevail on an ineffective assistance of counsel claim, he must show that his counsel's performance was deficient and that he suffered prejudice as a result of the deficient performance. *Strickland*, 466 U.S. at 687.

A defense attorney's failure to reasonably investigate a defendant's background and present mitigating evidence to the jury at sentencing can constitute ineffective assistance. *Wiggins v. Smith*, 539 U.S. 510, 522-23 (2003); *Williams v. Taylor*, 529 U.S. 362, 395-96 (2000). Defense counsel must either perform a reasonable investigation or make a reasonable decision that such investigation is unnecessary. *Wiggins*, 539 U.S. at 521; *Strickland*, 466 U.S. at 691. The duty to thoroughly investigate potential mitigating evidence exists regardless of the defendant's reluctance to investigate and disclose such evidence. *Porter v. McCollum*, 130 S. Ct. 447, 453 (2009) (per curiam); *Harries v. Bell*, 417 F.3d 631, 638 (6th Cir. 2005). However, a habeas petitioner cannot establish prejudice resulting from counsel's failure to conduct a thorough investigation when the petitioner refuses to allow the presentation of any mitigating evidence at the sentencing hearing. *Landrigan*, 550 U.S. at 480-81; *Owens v. Guida*, 549 F.3d 399, 412 (6th Cir. 2008).

Henness's counsel conducted a thorough investigation into potential mitigating factors. One of his attorneys obtained Henness's school records, police records, and prison records. He spoke with Henness's mother and sisters on multiple occasions. He also discussed with Henness's wife, father, stepmother, and other individuals the possibility of testifying during the mitigation stage. Counsel also retained a psychologist, who evaluated Henness and was available to testify. They subpoenaed a number of these individuals to appear at trial.

Despite counsel's efforts, Henness refused to allow them to use the mitigating evidence. He would not tell counsel whether he intended to make an unsworn statement to the jury, and he continually changed his mind regarding the witnesses he wished to

call at sentencing.  Henness directed his counsel to call witnesses they were not aware of and did not have time to prepare for.  In spite of the confusion, his counsel presented several witnesses during the mitigation phase, including supervisors from the local jail, fellow inmates, and police personnel who investigated the crime.  Henness also made an unsworn statement to the jury.

Even if we assume counsel's performance was deficient, Henness cannot show that he suffered prejudice because he prevented counsel from presenting the mitigating evidence available to them.  He refused to cooperate with his counsel during sentencing and would not allow them to introduce the mitigating evidence they discovered.  Instead, he directed counsel to call witnesses to testify about the investigation of his crime or his behavior in prison.  Accordingly, he cannot establish prejudice to support his ineffective assistance of counsel at sentencing claim.  *See Landrigan*, 550 U.S. at 476-77; *Owens*, 549 F.3d at 406.

Henness argues he does not need to show prejudice.  He relies on *United States v. Cronic*, 466 U.S. 648 (1984), which held that a presumption of prejudice is appropriate for ineffective assistance of counsel claims in certain situations.  *Id.* at 658-61.  The presumption may arise in three types of cases:  (1) when the accused is denied the presence of counsel at a critical stage, resulting in the complete denial of counsel; (2) when counsel does not subject the prosecution's case to any meaningful adversarial testing; and (3) when counsel is placed in circumstances in which competent counsel very likely would be unable to render effective assistance.  *Bell v. Cone*, 535 U.S. 685, 695-96 (2002); *Ivory v. Jackson*, 509 F.3d 284, 294 (6th Cir. 2007); *Mitchell v. Mason*, 325 F.3d 732, 742 (6th Cir. 2003).  He argues the third type occurred here, because the court's denial of counsel's motion to withdraw made it impossible for them to render effective assistance.

The third type of case is limited to circumstances of such magnitude that "the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial."  *Cronic*, 466 U.S. at 659-60; *see also Van v. Jones*, 475

F.3d 292, 305 (6th Cir. 2007).   Examples include:   when counsel is appointed immediately before the start of trial with the defendants facing a possible death sentence, *Powell v. Alabama*, 287 U.S. 45, 58-59 (1932); when the attitude of the community is one of great hostility and the defendant is actually in danger of mob violence, *id.* at 51; when state procedure allows for the appointment of counsel shortly before a pre-preliminary examination,[3] resulting in minimal preparation time, inadequate opportunity to meet and consult privately with the defendant, and a rushed decision-making process, *United States v. Morris*, 470 F.3d 596, 601-02 (6th Cir. 2006); and when recently-appointed counsel is compelled to proceed to trial without adequate preparation time because of the court's speedy trial concerns, *Hunt v. Mitchell*, 261 F.3d 575, 584-85 (6th Cir. 2001).

These egregious circumstances do not exist in Henness's case.   Defense counsel had sufficient time to prepare for the guilt and sentencing stages of his trial.   Indeed, the trial court's denial of counsel's motion to withdraw was based on its decision that new counsel would not have time to adequately prepare.   His attorneys were able to present several witnesses, notwithstanding the deteriorated relationship.   The *Cronic* presumption does not apply under these circumstances.

## D.     Failure to Provide *Brady* Material

Henness next argues that the State improperly withheld evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 87 (1963).   He failed to present this claim to the state courts.   He did raise the *Brady* claim in his state post-conviction petition, but the claim was conclusory and did not cite any specific evidence allegedly withheld by the prosecution.   As Henness never raised a claim in state court that relied on the evidence that underlies his current *Brady* claim, he must demonstrate cause and prejudice to obtain federal habeas review.   *Banks v. Dretke*, 540 U.S. 668, 690-91 (2004); *Bell v. Bell*, 512 F.3d 223, 231 n.3 (6th Cir. 2008).   If Henness can meet the elements of his *Brady* claim and the withheld evidence was the reason the claim was not presented to

---

[3]"The pre-preliminary examination procedure was established to reduce jail overcrowding by expediting cases via acceptance of plea offers."   *Morris*, 470 F.3d at 598 n.1.

the state court, he also has established cause and prejudice to excuse his procedural default. *Banks*, 540 U.S. at 691; *Bell*, 512 F.3d at 231 n.3. Thus, our procedural default analysis is encompassed within the discussion of the merits of his *Brady* claim.

*Brady* requires the prosecution to disclose all material exculpatory evidence to the defendant before trial. To succeed on a *Brady* claim, a habeas petitioner must show that (1) evidence favorable to the petitioner (2) was suppressed by the government and (3) the petitioner suffered prejudice. *Banks*, 540 U.S. at 691; *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Favorable evidence is "material" under *Brady* if a reasonable probability exists that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *Cone v. Bell*, 129 S. Ct. 1769, 1783 (2009). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). The withheld evidence must be considered collectively, rather than individually. *Apanovitch v. Houk*, 466 F.3d 460, 475 (6th Cir. 2006). The evidence supporting the defendant's conviction also must be considered when determining potential prejudice from a *Brady* violation. *Towns v. Smith*, 395 F.3d 251, 260 (6th Cir. 2005).

As the basis for his *Brady* claim, Henness points to several police informational summaries that were not provided to him prior to trial. Informational Summary #21 details a police interview with Teresa Thomas, a friend of Henness and Tabatha. Thomas stated that Henness was "extremely upset" that Tabatha was buying large quantities of crack cocaine from dealers who may have been Cuban. Henness argues that this statement is exculpatory because it supports his claim that Myers was mistakenly killed by Cuban drug dealers who actually were targeting Henness and Tabatha. Thomas's statement demonstrates that Henness was aware of Tabatha's alleged purchasing of crack cocaine from Cuban dealers. Since Henness was "aware of the essential facts that would enable him to take advantage of the exculpatory evidence,"

no *Brady* violation occurred.  *See Spirko v. Mitchell*, 368 F.3d 603, 610 (6th Cir. 2004) (citing *U.S. v. Todd*, 920 F.2d 399, 405 (6th Cir. 1990)).

Similarly, Informational Summary #39 revealed that, shortly before Myers's murder, Henness contacted the police about investigating an individual who used Tabatha to run drugs.  Henness argues that this action supports his contention that Myers's death was the result of a "drug deal gone bad." Henness already knew of his own contact with the police at the time of trial, so the prosecution's failure to provide this information was not a *Brady* violation.  *See id.*

Informational Summary #31 describes a police detective's interview with Henness's mother, Connie Parsons.  Parsons told the detective that Tabatha's mother, Mrs. James Keith, stated that Tabatha had been involved in a homicide.  Tabatha told Keith that she had witnessed the murder.  Henness maintains that Parsons's statement should have been disclosed to him.  Because this statement is hearsay and therefore inadmissible, Henness must demonstrate that the statement would lead to the discovery of additional, admissible evidence that could have resulted in a different result at trial. *See Wood v. Bartholomew*, 516 U.S. 1, 6 (1995).  Henness fails to make this showing. From Parsons's statement, it is not clear that the alleged murder witnessed by Tabatha involved Myers, the victim in this case.  Henness's speculation that it did involve Myers and could have led to additional information reflecting Tabatha's involvement in the murder is insufficient to establish a *Brady* violation.  *See id.* at 6-8 ("[I]t should take more than supposition on the weak premises offered by respondent to undermine a court's confidence in the outcome.").

Informational Summaries #36 and #37 revealed that, after Myers's murder, Parsons received a letter reading, "Tell your son we are serious."  The police performed fingerprint and handwriting testing on the letter and determined that Henness did not send it.  Henness asserts that this letter is significant because it supports his allegation that Myers was killed as part of a "drug deal gone bad," in which Tabatha was involved. However, the linkage between the letter and Myers's murder is tenuous.  The letter contains no suggestion that it involves Myers's death or the drug dealing by Tabatha or

Henness.  Speculation that the letter relates to the murder is insufficient to establish a reasonable probability that, had the evidence been disclosed to the defense, the result at trial would have been different.  *Cone*, 129 S. Ct. at 1783; *United States v. Bagley*, 473 U.S. 667, 682 (1985); *Apanovitch*, 466 F.3d at 474.

Finally, considering the evidence cumulatively, Henness does not establish a reasonable probability that the result of his trial would have been different had the evidence been disclosed to the defense.

**E.      Testimony of Tabatha Henness, Richard Curtis, and the Coroner**

Henness next argues that his trial was fundamentally unfair because of the trial court's evidentiary rulings.  Specifically, he argues that the trial court improperly (1) held that Tabatha was competent to testify; (2) admitted Curtis's testimony concerning a post-arrest conversation between Henness and his wife; and (3) permitted the coroner to testify on a matter outside his field of expertise.[4]  A state court's evidentiary ruling is generally not cognizable in federal habeas corpus, unless the decision was so fundamentally unfair that it amounts to a due process violation.  *Bey v. Bagley*, 500 F.3d 514, 519-20 (6th Cir. 2007).  When reviewing a claim of evidentiary error in a federal habeas petition, we defer to the state court's interpretation of its own rules of evidence and procedure.  *Miskel v. Karnes*, 397 F.3d 446, 453 (6th Cir. 2005).

### i.      Tabatha Henness's Testimony

Henness first argues that the trial court improperly held that Tabatha, his wife, was competent to testify.  Henness raised this claim on direct appeal, so there is no procedural default issue.

Under Ohio Evid. R. 601(B), a spouse is not competent to testify against her spouse unless she elects to do so.  She must make a deliberate choice to testify, with an understanding of her right to refuse.  *State v. Adamson*, 650 N.E.2d 875, 877 (Ohio

---

[4]We also granted Henness a COA for his claim that the trial court improperly permitted the prosecutor to lead Curtis's testimony and allowed Curtis to engage in improper speculation, but Henness does not raise this issue in his brief on appeal.  This claim is therefore abandoned and not reviewable.  *See Grace Cmty. Church v. Lenox Twp.*, 544 F.3d 609, 618 n.1 (6th Cir. 2008).

1995).  In Ohio, the trial court must instruct the witness on the issue of spousal competency and find, on the record, that she voluntarily chose to testify.  *State v. Brown*, 873 N.E.2d 858, 870 (Ohio 2007).

Prior to trial, Tabatha sent Henness letters stating that she would not testify against him.  She changed her mind, however, by the time of trial.  Before she testified, the court advised her of her right not to testify unless she chose to do so, and confirmed that she understood her right.  Tabatha said that she wanted to testify.  During defense counsel's examination, Tabatha repeated her desire to testify and stated that she had not been threatened in any form and was not being coerced.  Defense counsel later opined in a post-trial affidavit that Tabatha acted under improper pressure from the prosecution, but her in-court statements belie this claim.  Her voluntary intent to testify is clear from the record.

Henness maintains that Tabatha's actions subsequent to testifying raise questions about whether her choice to testify was truly voluntary.  After testifying on direction examination, Tabatha fled the jurisdiction and did not return for a week.  When she returned, the trial court conducted a voir dire examination.  Tabatha explained that her trial testimony made her "nervous and stressed out."  She returned because she knew she was under subpoena and could be arrested for failing to return, but no one made any threats or promises to induce her to return.  Accordingly, the trial court concluded that Henness would suffer no prejudice if Tabatha was allowed to finish testifying.  Under these circumstances, Henness does not show that the admission of Tabatha's testimony was so fundamentally unfair that it resulted in a due process violation.

Henness also argues that Tabatha was not mentally and emotionally competent to choose to testify against him.  He presented evidence in the district court of her history of suicide attempts, mental health treatment, and antidepressant and anti-anxiety medications.  He claims that Tabatha was not taking her medication at the time of his trial, which rendered her incapable of intelligently and voluntarily deciding to testify.  However, Henness never made this argument or presented this evidence to the state courts.  Therefore, we cannot consider those facts in reviewing this claim.  *See Cullen*

*v. Pinholster*, 563 U.S. __, 131 S. Ct. 1388, 1398-1400 (2011); *Alley v. Bell*, 307 F.3d 380, 386 (6th Cir. 2002).

### ii.     Richard Curtis's Testimony

Shortly after Tabatha testified, Henness telephoned Curtis and asked him to tell Tabatha that he still loved her and did not hold her testimony against her. During closing argument, the prosecution asserted that this phone call demonstrated the truthfulness of Tabatha's testimony. Henness argues that the prosecution's use of Curtis's testimony constitutes improper vouching for Tabatha's credibility. Henness acknowledges that he did not raise this claim on direct appeal, but argues that the ineffectiveness of his appellate counsel in failing to raise the claim constitutes cause to excuse the procedural default. Regardless, Henness's claim fails on the merits.

"Improper vouching occurs when a prosecutor supports the credibility of a witness by indicating a personal belief in the witness's credibility thereby placing the prestige of the [State] behind that witness." *United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999). Typically, improper vouching involves comments or some implication by the prosecutor that he has some special knowledge of facts not before the jury related to the credibility of a witness. *Johnson v. Bell*, 525 F.3d 466, 482 (6th Cir. 2008).

The prosecutor's statement regarding Curtis's testimony does not amount to improper vouching. The entire content of Henness's phone conversation with Curtis was submitted to the jury for their determination of its impact on Tabatha's credibility. Hence, the prosecutor was not suggesting he had special knowledge of facts unavailable to the jury. Moreover, Henness's statements could equally be construed as forgiving Tabatha for testifying falsely against him.

### iii.     The Coroner's Testimony

Henness also argues that the trial court improperly admitted the testimony of the coroner concerning the use of a sound-muffling tool in the murder. The coroner noted that some of the bullets did not penetrate the victim's skull as deeply as would be expected, and he speculated that something was placed between the gun and the victim

to quiet the sound of the gun.  The Ohio Court of Appeals determined that this opinion may have been outside the coroner's area of expertise, but any error was harmless.  The coroner characterized his opinion as theoretical and stated that he did not "know if he [could] answer that per se."  Henness responds that the coroner's testimony was not harmless, because it supported the conclusion that Henness premeditated intent to murder Myers.

The admission of the coroner's testimony did not render Henness's trial so fundamentally unfair as to result in a due process violation.  While the coroner's testimony supported a finding of premeditation, there was other evidence that Henness intended to murder Myers.  Specifically, Henness stole Myers's car, credit card, and other possessions to fund his drug addiction.

**F.     Erroneous Jury Instruction**

Finally, Henness contends the trial court erroneously instructed the jury during the sentencing phase.  He failed to raise this claim in state court, but argues that the ineffectiveness of his appellate counsel constitutes cause to excuse procedural default. Regardless, his claims fail on the merits.

First, Henness argues the trial court improperly instructed the jury to unanimously determine the existence of mitigating factors.  The trial court instructed:

> The existence of mitigating factors does not preclude or prevent the death sentence, if you find beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors.  However, if you are not convinced by proof beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors, then you must choose one of the two live [sic] sentences.
>
> You shall sentence the Defendant to death only if you unanimously find by proof beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors.
>
> If you do not so find, you shall unanimously sign a verdict of either life with parole eligibility after serving 20 full years of imprisonment or a sentence of life with parole eligibility after serving 30 years of imprisonment.

The Constitution forbids imposition of the death penalty if the sentencing judge or jury is "precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Smith v. Spisak*, 558 U.S. __, 130 S. Ct. 676, 681-82 (2010) (internal emphasis omitted) (quoting *Mills v. Maryland*, 486 U.S. 367, 374 (1988)). The jury also "may not refuse to consider or be precluded from considering any relevant mitigating evidence." *Id.* at 682 (internal quotation marks omitted). Thus, the jury instructions and verdict forms in *Mills* were unconstitutional because they told the jury that it could not find a particular circumstance to be mitigating unless all 12 jurors agreed that the mitigating circumstance had been proved. *Id.*

Here, the instructions did not require the jury to determine the existence of each individual mitigating factor unanimously. *See id.* at 684. Instead, "[t]hey focused only on the overall balancing question." *Id.* These instructions, therefore, do not implicate "the circumstance that *Mills* found critical, namely, a substantial possibility that reasonable jurors . . . may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance." *Id.* (quoting *Mills*, 486 U.S. at 384) (internal quotation marks omitted).

Henness also argues that the jury instructions required the jury to unanimously reject a death sentence before considering the life sentence options. He cites, for the first time in his reply brief, the dissent in *Goff v. Bagley*, 601 F.3d 445, 459 (6th Cir. 2010). The *Goff* dissent, in turn, cited the Supreme Court's decision in *Beck v. Alabama*, 447 U.S. 625 (1980), which held that "death or acquit" jury instructions in the guilt phase of a capital case violate due process. Before oral argument, he also cited *Mitts v. Bagley*, 620 F.3d 650 (6th Cir. 2010), but that has now been reversed in *Bobby v. Mitts*, 131 S. Ct. 1762 (2011) (per curiam).

Assuming the instructions in this case in fact constitute "acquittal-first" instructions,[5] the instructions here are "surely not" invalid under *Beck*. *Bobby v. Mitts*, 131 S. Ct. at 1764; *see also Spisak*, 130 S. Ct. at 684. "The concern addressed in *Beck* was the risk of an unwarranted *conviction* created when the jury is forced to choose between finding the defendant guilty of a capital offense and declaring him innocent of any wrongdoing." *Id.* (internal quotation marks omitted); *see also Spaziano v. Florida*, 468 U.S. 447, 455 (1984) ("The goal of the *Beck* rule . . . is to eliminate the distortion of the factfinding process that is created when the jury is forced into an all-or-nothing choice between capital murder and innocence."); *Schad v. Arizona*, 501 U.S. 624, 646 (1991) ("Our fundamental concern in *Beck* was that a jury convinced that the defendant had committed some violent crime but not convicted that he was guilty of a capital crime might nonetheless vote for a capital conviction if the only alternative was to set the defendant free with no punishment at all.").

As the Court concluded in *Bobby v. Mitts*, the jury instructions here concern the penalty phase, not the guilt phase, and "the logic of *Beck* is not directly applicable to the penalty phase proceedings." *Id.* Indeed, there is a "fundamental difference between the nature of the guilt/innocence determination at issue in *Beck* and the nature of the life/death choice at the penalty phase." *California v. Ramos*, 463 U.S. 992, 1007 (1983). Thus, "the concern of *Beck* regarding the risk of an unwarranted conviction is simply not directly translatable to the deliberative process in which the capital jury engages in determining the appropriate penalty." *Id.* at 1009.

**AFFIRMED.**

---

[5]The district court determined that the instructions were not "acquittal-first" instructions, because they did "not require jurors to unanimously reject death as an appropriate sentence before considering a life sentence." *Henness*, 2007 WL 3284930, at *60.