**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 13a0577n.06

**No. 11-2425**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| J.D. FULLER, JR., | ) | |
| | ) | **FILED** |
| Petitioner-Appellant, | ) | ***Jun 14, 2013*** |
| | ) | DEBORAH S. HUNT, Clerk |
| v. | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| JEFFREY WOODS, | ) | STATES DISTRICT COURT FOR THE |
| | ) | EASTERN DISTRICT OF MICHIGAN |
| Respondent-Appellee. | ) | |

Before: BATCHELDER, Chief Judge, SUHRHEINRICH, and SUTTON, Circuit Judges.

SUTTON, Circuit Judge. A Michigan jury convicted J.D. Fuller of criminal sexual conduct with his two granddaughters. Fuller filed a petition for habeas relief, arguing in part that the trial court violated his Confrontation Clause rights by restricting the scope of cross-examination of one of the victims, S.P. The district court denied Fuller's petition, and we affirm.

I.

Fuller was a pastor at his church, and he married his wife, Darlene, in 1997. At that point, Fuller already had a daughter, Jannetta, who had three children of her own: the victims, S.P., age ten at the time of the incidents, and Y.H., age six, as well as a son, age eight. Fuller, Darlene, Jannetta, Jannetta's then-husband and Jannetta's children lived together with Fuller for about four months between 1999 and 2001. From 2001 to 2003, Fuller's grandchildren spent nights and

weekends at Fuller's house, and Fuller, according to the jury verdict, repeatedly molested his granddaughters during this period. The abuse came to light when S.P. told her cousin, who convinced S.P. to talk to her mother.

In the absence of physical evidence of abuse, the prosecution's case relied heavily on S.P.'s and Y.H.'s testimony. S.P. gave the most extensive descriptions of abuse. On at least three occasions, Fuller applied various substances, one of them cherry-flavored, to his "private part," and he "made" S.P. "suck it off" until he reached climax. R.8-8 at 56. He applied lotion to and moved "his finger in" S.P.'s "private part" multiple times. *Id.* at 64, 68. Fuller "put his private part in the back of" S.P., *id.* at 68, and "stuck his private part in" S.P.'s "private part," *id.* at 76–77, at least ten times. Fuller also made S.P. touch "his private part" with her hand. *Id.* at 79–80. Fuller was nude during some of these incidents, and S.P. saw scars from Fuller's hip surgery. S.P. also saw Fuller "put his finger in [Y.H.'s] private part" at least once. *Id.* at 74.

Y.H. also discussed incidents of molestation. Fuller touched her "private part," R.8-7 at 203, "more than three" times, *id.* at 205, sometimes when she was wearing underwear, sometimes when she was not. Fuller would also "[m]ov[e]" his finger" "[b]ack and forth" on Y.H.'s "private" part. *Id.* at 210. Other times, Fuller put cream or rubbed a cotton ball with oil on her "private" part. *Id.* at 216. Fuller also touched Y.H.'s "bottom," *id.* at 218, and showed his grandchildren a film with "[a] girl and a boy making love." *Id.* at 226. Fuller told S.P. and Y.H. not to disclose the abuse to anyone or he would "whop" them. R.8-8 at 72; R.8-7 at 214.

Fuller tried to rebut this testimony by attacking S.P.'s credibility. During cross-examination, defense counsel elicited a number of statements from S.P. that contradicted her earlier testimony. Her conflicting statements covered subjects like whether she "really [did not] like [her] grandfather because all he does is lay around and smoke cigarettes," R.8-8 at 105; the number of times Fuller applied baby wash to her "private part," *id.* at 110–11; whether the first person she told about the abuse was her mother or her cousin; and whether Fuller ever "put" her "on top" during intercourse, *id.* at 140–41, 160–61. These inconsistencies among others laid the foundation for Fuller's theory that the case was "premised upon a lie . . . told by" S.P. R.8-11 at 58. At closing arguments, defense counsel stressed that S.P. and Y.H. both tried to recant their stories before eventually sticking with them, that S.P. told other lies and that the allegations of abuse changed over time.

Before trial, the court held a preliminary examination at which S.P. and Y.H. testified. During cross-examination of S.P., the following exchange took place:

> Q. Do you remember something happening between your mother's friend's daughter and you? Remember something getting—
> A. Yes.
> Q. Can you tell us what happened?
> A. We was up in her room playing.
> Q. And that's it?
> A. No. We was in her room playing and then after that she had got on top of me.
> Q. And something happened when that occurred, didn't it?
> A. Yes.
> Q. And you were embarrassed by what happened, right, when someone found out?
> A. Yes.
> Q. And you were going to get in trouble, weren't you, for that?
> A. I can't remember.
> Q. Something happened at the church, at Mt. Calvary Church? You're familiar with that?
> A. Yes.

Q.      There was something that happened in a bed?
A.      Yes.
Q.      Do you remember that?
A.      Yes.
Q.      With a boy?
A.      Yes.
Q.      You were going to get in trouble for that, right?
A.      Yes, by my grandfather because he said he was going to tell my mom.
Q.      And you didn't want him to do that?
A.      No.

R.8-3 at 22–23.  Immediately before trial, the prosecutor (Ms. Weingarden) asked the judge to limit

the ability of defense counsel (Mr. Toco) to reference these incidents during cross-examination:

MS. WEINGARDEN:      [A]t the preliminary examination . . . Defense Counsel asked [S.P.] . . . about other sexual acts she was involved with other people.  And that was clearly in violation of the Rape Shield Law.  I would ask counsels not to bring that out.  They have not given notice that they plan on bringing that out. . . .

MR. TOCO:      Judge, this is not going to Rape Shield but more to motive, definitely more probative than it is prejudicial.  This a situation where we contend this is a young lady that has not only engaged in other sexual acts with other children.  It's [not a] situation where she has engaged with other adults, but also has a history of lying about those sexual acts, Judge.  That goes to the heart of the motive in this case. . . . Judge, we are going to touch on it very very briefly, but, Judge, that is at the heart of our defense, these other acts.

. . .

These are part of this young lady's history.  To say that they're sexual acts I think is a little misleading.

. . .

The situation where one occasion the young lady was found lying on top of another little boy.  Hardly a sexual act.  Another situation where she was found in bed lying with another little girl.  Hardly a sexual act.  Situation in school where little boys were asking her about sexual things, but not a sexual act, Judge.

> . . . These are part of the facts in the case and goes to the heart of our defense that this young lady has engaged in other acts similar to the one that she is accusing my client of and lying about that.
>
> THE COURT: Anything further?
> MS. WEINGARDEN: I think it's clearly Rape Shield prohibited.
> THE COURT: Well, the Court will not allow it.

R.8-6 at 4–7.

After a five-day trial and two hours of deliberation, the jury convicted Fuller of seven counts of first-degree criminal sexual conduct (penetration) and two counts of second-degree criminal sexual conduct (contact). The trial court sentenced him to concurrent prison terms of 15 to 40 years on the first-degree convictions and concurrent terms of two-and-a-half to 15 years on the second-degree convictions. Fuller appealed and raised four issues but did not bring a Confrontation Clause claim. The Michigan Court of Appeals denied relief on all four claims, and the Michigan Supreme Court denied leave to appeal.

Fuller sought state post-conviction relief, claiming in part that his "right to confront witnesses against him as guaranteed by the 6th Amendment . . . was violated" when the trial court limited the scope of cross-examination, and that he "received ineffective assistance of counsel on appeal when counsel failed to raise [this] issue[]." R.8-15 at 2–3. A state court judge denied relief under Michigan Court Rule 6.508(D). That rule prevents a defendant from asking for post-conviction relief on grounds that "could have been raised on [direct] appeal" unless the defendant shows "good cause" and "actual prejudice." The state court held that Fuller failed to show cause or prejudice, and the Michigan appellate courts denied leave to appeal.

Proceeding *pro se*, Fuller filed a federal habeas petition premised on his Sixth Amendment claim. The district court denied his petition but granted a certificate of appealability on the issue.

II.

Fuller argues that ineffective assistance of appellate counsel excuses his procedural default. As with ineffective assistance claims concerning trial counsel, claims concerning appellate counsel must satisfy the *Strickland* standard: They must prove that their counsel's performance was deficient, and that the deficient performance was prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Whether appellate counsel was constitutionally ineffective involves a number of factors, including "the strength of the claim that counsel failed to raise." *Henness v. Bagley*, 644 F.3d 308, 317 (6th Cir. 2011). We do not expect appellate lawyers to "raise *every* nonfrivolous claim" apparent in the record (and indeed caution them not to); strategic lawyers will "select from among them in order to maximize the likelihood of success on appeal." *Smith v. Robbins*, 528 U.S. 259, 288 (2000) (emphasis added). Even if the defendant might have won his appeal on a non-included claim, "the court still must consider whether the claim's merit was so compelling that the failure to raise it amounted to ineffective assistance of appellate counsel." *Henness*, 644 F.3d at 317.

Even if we assume that AEDPA deference does not apply to this claim and that we must as a result give fresh review to it, a point we need not finally resolve, Fuller's claim fails on the merits at the first step of *Strickland*. *Boggs v. Collins*, 226 F.3d 728 (2000), helps to point the way. Roger Boggs was convicted in state court of raping Elizabeth Berman, and Boggs made the credibility of

his accuser a key question at trial. To that end, Boggs wanted to cross-examine Berman about a prior

false rape accusation she allegedly made against another man one month earlier. The trial court

forbade that line of questioning based in part on rape shield concerns. Boggs raised a Confrontation

Clause argument in his federal habeas petition. After reviewing it de novo, we rejected the claim,

distinguishing "cross-examination as to bias, motive or prejudice" from "cross-examination as to

general credibility." *Id.* at 737. The former type of questioning tries to pinpoint a specific

explanation for why a witness might be testifying falsely—say that a rape accuser holds a pre-

existing grudge against the defendant and wants to see him suffer. The latter type of questioning

tries only to show that the witness has lied before and may be lying again. The Confrontation Clause

protects a defendant's right to explore specific motivations, but it "does not *require* that a defendant

be given the opportunity to wage a general attack on credibility by pointing to individual instances

of past conduct." *Id.* at 740. Boggs's proposed line of questioning—Berman lied about a rape

before and she may be lying about this rape—was a general attack on credibility, and we held that

the state court permissibly rejected it.

The merits of Fuller's Confrontation Clause claim parallel Boggs's in all important ways.

Fuller, like Boggs, was convicted of rape. Fuller, like Boggs, had the opportunity to cross-examine

his accuser. But the trial court stopped Fuller, like Boggs, from pursuing a line of questioning that

suggested his accuser had lied about sexual situations in the past, invoking a state rape shield law.

Contrary to Fuller's suggestions, his proposed line of questioning, like Boggs's, was a general attack

on credibility, not a specific theory about bias. Fuller has no explanation for why this testimony

would have shed light on S.P.'s motivations other than at the level of generality of saying S.P. had lied about sexual situations in the past and continues to do so today. In view of the similarities between the two cases, it is difficult to hold that a reasonable attorney would have, or should have, felt compelled to bring Fuller's Confrontation Clause claim on pain of being labeled constitutionally ineffective.

We are not alone in applying the Confrontation Clause this way. Michigan law, for one, follows a similar course. "[I]n the vast majority of cases, evidence of a rape victim's prior sexual conduct . . . for general impeachment is inadmissible," except when the evidence is relevant to the "complaining witness' bias" or "ulterior motive." *People v. Hackett*, 365 N.W.2d 120, 124–25 (Mich. 1984). Other "federal circuit courts . . . have . . . held that a defendant fails to state a confrontation-clause violation where the testimony barred by the rape-shield law challenges only the witness's general credibility," even in cases involving prior false accusations. *Jordan v. Warden, Leb. Corr. Inst.*, 675 F.3d 586, 596 (6th Cir. 2012); *see, e.g.*, *Ellsworth v. Warden, N.H. State Prison*, 333 F.3d 1, 8 (1st Cir. 2003) (en banc) (rejecting Confrontation Clause argument in sex abuse case because "there is nothing unusual about limiting extrinsic evidence of lies told by a witness on other occasions"); *Redmond v. Kingston*, 240 F.3d 590, 593 (7th Cir. 2001) (contrasting evidence of motive with "evidence that a person has lied in the past to show that she is lying now," and calling the latter "questionable"); *Quinn v. Haynes*, 234 F.3d 837, 851 & n.13 (4th Cir. 2000) (denying relief when state court excluded evidence of prior accusations and noting that the evidence was meant only "to impeach [the] witness's general credibility"); *Hughes v. Raines*, 641 F.2d 790, 793 (9th Cir.

1981) ("The object of the intended cross-examination in this case was not to establish bias against the defendant or for the prosecution; it merely would have been to attack the general credibility of the witness on the basis of an unrelated prior [accusation]."). This range of authority underscores the difficult climb Fuller's argument would have faced in state court—and the reasonableness of not raising the Confrontation Clause argument.

Even if Fuller had a right to argue that S.P. was a liar by nature, moreover, he did not have a right to make the point in each and every way he wished. "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on [bias] cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986); *cf. Nevada v. Jackson*, No. 12-694, slip op. at 4 (U.S. June 3, 2013) ("Only rarely have we held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence."). When a trial court lets defense counsel argue that "evidence of [a witness's] multiple inconsistent and untruthful statements . . . illustrate[s] a propensity to lie" but excludes certain statements the lawyer wants to bring up, that limitation usually "does not rise to a violation of the Confrontation Clause." *Couturier v. Vasbinder*, 385 F. App'x 509, 515 (6th Cir. 2010); *see also Wiecek v. Lafler*, 417 F. App'x 443, 447 (6th Cir. 2011). Here, the trial court gave Fuller's attorney plenty of leeway to impeach S.P.'s credibility. On cross-examination, S.P. admitted to various inconsistencies in her testimony regarding the specific incidents of abuse, and defense counsel reiterated these and related points repeatedly during

closing arguments. On this record, reasonable appellate counsel could permissibly conclude that the jury "had enough information, despite the limits placed on otherwise permitted cross-examination, to assess the defense theory." *Dorsey v. Parke*, 872 F.3d 163, 167 (6th Cir. 1989). No ineffective assistance occurred.

III.

For these reasons, we affirm.