**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0503n.06

No. 11-1476

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

*May 15, 2012*

LEONARD GREEN, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| **Plaintiff-Appellant,** | ) | **ON APPEAL** FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| ANTHONY ROBERT WILLIAMS, | ) | |
| | ) | |
| **Defendant-Appellee.** | ) | **O P I N I O N** |
| _____ | ) | |

Before: SUHRHEINRICH, MOORE, and CLAY, Circuit Judges.

**KAREN NELSON MOORE, Circuit Judge.** Defendant-Appellee Anthony Williams was charged with one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Police found the firearms in plain view in Williams's vehicle after initiating a traffic stop based in part on a face-to-face informant's tip that Williams was in possession of a handgun. Finding no reasonable suspicion to support the stop, a magistrate judge recommended granting Williams's motion to suppress the evidence. The district court adopted that recommendation. Because that ruling relied on reasoning that is inconsistent with precedents decided subsequent to the district court's order, we **REVERSE** the district court's judgment and **REMAND** for further proceedings.

**I. BACKGROUND & PROCEDURE**

The facts of this case are essentially undisputed. On June 11, 2009, Project Safe Neighborhoods, an initiative of the Flint, Michigan police department, began a surveillance operation seeking information concerning certain individuals believed to have been involved in a shooting or robbery in the area of Woodhall Street. The operation centered on a particular address, 1422 Woodhall, which was known to be a site of frequent criminal activity, including gang shootings and drug transactions. Officer Scott Watson was stationed near that location and, from his vantage point, could see vehicles and people coming and going from the house.

While conducting surveillance, two vehicles caught Watson's attention. The first was a gray Impala that officers knew to have been associated with prior shootings, robberies, and other criminal activity. The second was a blue Cadillac, which Watson observed departing from, returning to, and then again departing from the area, all nearly simultaneously with the Impala and within about a half-hour period. Although the vehicles traveled in different directions and Watson never observed any contact between their occupants, Watson nonetheless suspected that the vehicles were somehow associated based on their contemporaneous arrival and departure times. Watson radioed his suspicion, along with descriptions of the vehicles, their respective directions of travel, and any updates on their movements to other officers assisting with the surveillance operation, and those officers picked up the trail.

Not long thereafter, officers in an unmarked SUV located the gray Impala. As the officers watched, the gray Impala entered a party-store parking lot and one of its occupants engaged in what the officers believed was a hand-to-hand drug transaction. Officer Scott Wright then radioed that information to the other members of the surveillance team. A few minutes later, Officer Charles Barker again located the Impala after it left the party store and watched as the driver parked and

2

began walking toward a house. Barker exited his patrol car and asked the driver if he had just come from a party store and whether he had a driver's license. The driver responded affirmatively to the first question, but said he did not have a license. Noting a small amount of marijuana on the ground, Barker conducted a pat down, which uncovered a small amount of additional marijuana, and placed the driver in handcuffs in the back of his patrol car. Fearing that the car would be impounded and towed, the driver asked to speak with an undercover officer to share some helpful information concerning "a vehicle that contained a gun." R. 32 (Suppression Hr'g Tr. at 42, 80). Officers Felix Trevino and Scott Wright arrived a few minutes later and spoke with the driver in the backseat of the patrol car.

At the suppression hearing, Officer Wright testified about that conversation. Wright stated that he had no prior familiarity with the driver of the Impala ("the informant"), and that he did not learn the informant's name during the course of their conversation. Wright was aware, however, that the informant hoped to avoid having his car towed by providing the information. To that end, the informant described a blue late-model Cadillac that was in "rough condition," and was being driven by a black male. *Id.* at 42, 56. The informant further indicated that the Cadillac to which he was referring had "just come off of Woodhall" and "that the driver of the vehicle had a handgun on him." *Id.* at 42. When asked whether the informant provided any further details, Wright responded: "I believe he told me actually what caliber the gun was," and that the gun was "for sale." *Id.*; *see also id.* at 56.

When they were finished talking, Wright relayed the information to the other officers on the operation and left to begin searching for the Cadillac. Officer Barker remained with the Impala and, as he waited for a tow truck to arrive, obtained identifying information for the Impala and its

occupants. The informant was ultimately released, though whether the release coincided with Williams's arrest is unclear from the record. Although a tow truck did come out to the scene, Officer Barker did not recall whether the Impala was actually towed.

Not long after Wright left the informant, Wright located a car matching the informant's description that was parked at a gas station a few blocks from Woodhall Street. After observing a black male returning to the car, Wright initiated a stop by blocking the Cadillac from exiting the gas station parking lot while other officers moved in from behind. As officers approached the vehicle, they noted a passenger, previously obscured from view, who was holding an assault rifle. After ordering Williams from the vehicle, officers also observed a handgun between the front seats. The officers placed Williams under arrest.

Following his indictment, Williams filed a motion to suppress the firearms, maintaining that the officers lacked reasonable suspicion to perform the traffic stop. The magistrate judge agreed and recommended granting Williams's motion to suppress. Two conclusions featured predominantly in the accompanying analysis. First, the magistrate judge concluded that the tip regarding the existence of a gun in the vehicle, even if reliable, did not amount to an allegation of ongoing criminal activity. R. 37 (Report & Recommendation at 7–8). Second, the magistrate judge concluded that the tip was lacking any indicia of reliability and that the unknown identity of the informant rendered it analogous to an anonymous tip. *Id.* at 14–15. Accordingly, the magistrate judge gave the tip little weight.

The district court adopted the magistrate judge's report and recommendation "in its entirety," R. 39 (Dist. Ct. Op. at 1), but focused most of its attention on the magistrate judge's discussion of existence of an allegation of illegality, the reliability of the informant, and the absence of any

4

conduct on Williams's part to suggest suspicious behavior. *Id.* at 5–7. The district court reiterated the magistrate judge's concerns about the Impala driver's reliability and veracity as an informant, and noted also that "[t]he officers did not have any information which they could use to substantiate the informant's tip." *Id.* at 6–7. Finding that the circumstances amounted to little more than an assertion that Williams had been observed in a high-crime area, the district court granted Williams's motion to suppress. *Id.* at 7–8. The government timely appealed.

## II. ANALYSIS

The government argues that the officers had reasonable suspicion to stop Williams based on their personal observations of the blue Cadillac as corroborated by the informant's tip. In particular, the government asserts that the face-to-face nature of the officers' interaction with the informant rendered the tip more reliable than the anonymous tips analyzed in the cases on which the district court relied. Citing a specific Michigan statute that prohibits individuals from carrying a gun in a car without a license, the government also challenges the district court's determination that the informant's tip did not allege that Williams was engaged in illegal activity at the time of the stop. We agree with the government that the district court's evaluation of these issues was rendered erroneous by this court's recent decisions in *Henness v. Bagley*, 644 F.3d 308 (6th Cir. 2011), *cert. denied*, ---- S. Ct. ----, No. 11-8618, 2012 WL 359583 (Apr. 23, 2012), and *United States v. Galaviz*, 645 F.3d 347 (6th Cir. 2011), although both decisions were decided subsequent to the district court's ruling.

We review the district court's factual findings on a motion to suppress for clear error and its legal conclusions de novo. *United States v. See*, 574 F.3d 309, 313 (6th Cir. 2009). "Where the district court grants a motion to suppress, this court reviews the evidence in the light most favorable

5

to the defendant." *United States v. Bailey*, 302 F.3d 652, 656 (6th Cir. 2002). The legality of the traffic stop depends on "whether, at the moment that they initiated the stop, the totality of the circumstances provided the officers with the reasonable suspicion required in order to detain a citizen under *Terry* [*v. Ohio*, 392 U.S. 1 (1968)]." *Feathers v. Aey*, 319 F.3d 843, 848–49 (6th Cir. 2003); *see also United States v. Arvizu*, 534 U.S. 266, 273 (2002) ("When discussing how reviewing courts should make reasonable-suspicion determinations, we have said repeatedly that they must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." (internal quotation marks omitted)). Although context-based factors, such as proximity to a high-crime area, may play a role in the analysis, they do not alone give rise to reasonable suspicion. *United States v. Johnson*, 620 F.3d 685, 692–93 (6th Cir. 2010).

## A. The Distinction Between Anonymous Tipsters and Unknown, Face-to-Face Informants

We begin our reasonable-suspicion analysis by reviewing the district court's assessment of the reliability of the informant's tip. Initially, when part of the reasonable-suspicion equation includes a tip from an informant, the weight to which that tip is entitled falls along a broad spectrum. On the one hand, tips from anonymous informants are generally entitled to little weight because they provide slim, if any, opportunity to assess the reliability and credibility of the individual providing the information. Thus, "[u]nlike known or identified informants, anonymous tipsters, without more, cannot be deemed reliable regarding their allegations." *Feathers*, 319 F.3d at 849. As the district court correctly recognized, a tip that fails to make any allegation of illegality is likewise entitled to little weight. *See Johnson*, 620 F.3d at 693 ("Reasonable suspicion 'requires that a tip be reliable

6

*in its assertion of illegality*, not just in its tendency to identify a determinate person.'" (quoting *Florida v. J.L.*, 529 U.S. 266, 272 (2000))).

On the other hand, tips from known or reliable informants are generally entitled to substantially more weight. *See J.L.*, 529 U.S. at 270 (distinguishing an anonymous tip from "a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated"). Tips that provide specific details or predictions of future action fall higher on the reliability scale because they suggest the existence of knowledge to which the public might not have access. *Alabama v. White*, 496 U.S. 325, 332 (1990). Between these two extremes is a sliding scale; "[t]hus, if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable." *Id.* at 330. Accordingly, the weight of an informant's tip in the overall reasonable-suspicion analysis must be determined case by case.

After evaluating the circumstances in the present context, the magistrate judge effectively relegated the informant's statement to that of an anonymous tipster, concluding that the unidentified driver's tip so resembled an anonymous one that it should be treated as such in the reasonable-suspicion calculus. The district court agreed. As our decision in *Henness v. Bagley* demonstrates, however, several analytical missteps undermine that result. Specifically, *Henness* concluded that a face-to-face, though unnamed, tipster could be sufficiently reliable to provide the reasonable suspicion for an investigative stop. *Henness* was based primarily on the unique attributes of face-to-face informants that distinguished such informants—even if unnamed—from traditional anonymous tipsters. *Henness*, 644 F.3d at 318–19. More importantly, a number of the factors we cited as support for our determination in *Henness* are directly applicable here.

7

Initially, *Henness* made the broad observation that face-to-face informants are generally more reliable because officers in those cases have "an opportunity to observe the informant's demeanor and credibility." *Id.* at 318. As in *Henness*, the officers here had ample opportunity to assess directly the informant's behavior and veracity as they spoke with him in the back of the patrol car. *See id.* at 319. Such personal exposure therefore enhanced the informant's reliability in a way that the district court did not consider.

Furthermore, *Henness* also noted that even when an informant's identity is unknown, an officer's recent observance of the informant's physical appearance and location make it possible to hold the informant accountable for giving officers false information—a fact that also goes to the enhanced reliability of such informants. *Id.* at 318–19. This analysis undermines the magistrate judge's reasoning in two ways. First, *Henness*'s distinction between unidentified and anonymous informants directly contravenes the magistrate judge's suggestion that the distinction between being anonymous and being unknown but identifiable was essentially meaningless in this case. *See* R. 37 (Report & Recommendation at 10) ("It is not clear if merely being identified, or identifiable, as opposed to being an anonymous tipster, means anything in the absence of firsthand information."). Second, contrary to the magistrate judge's conclusion, the possibility that the informant would be held accountable for the information he provided was clearly present here. *See* R. 37 (Report & Recommendation at 15) (opining that the informant "may not have been accountable for providing false information" because "no evidence presented at the hearing suggested the informant was at risk if he provided false information"). Because police had the informant handcuffed in the back of the patrol car—albeit temporarily—the informant faced a real risk of repercussions if the information he provided proved false. This was especially true given the informant's knowledge of the close

8

proximity of the Cadillac, which logically would have suggested a brief time frame in which his tip could have been confirmed or dispelled. Moreover, the informant's stated desire to avoid having his car towed provided him with a concrete reason to provide viable information and gave the officers some leverage with which to hold the informant accountable if the information turned out to be incorrect.

Finally, the district court discounted the tip because it failed to specify a basis for the informant's knowledge. But *Henness* suggests that the driver's recent and close proximity to the blue Cadillac supports at least an inference that the information provided *was* based on personal knowledge. *See Henness*, 644 F.3d at 318 ("[A]n in-person informant's proximity in time and space to the reported criminal activity indicates the reliability of the tip, because it reflects that the informant acquired the information firsthand."). Moreover, as discussed further below, the information here related, as it had in *Henness*, to "criminal activity that had recently occurred in the vicinity." *Id.* at 319. Thus, these facts also elevated the informant's reliability in this case above that of an anonymous tipster.

As this analysis demonstrates, our precedents require that tips from anonymous informants be weighed differently in the reasonable-suspicion or probable-cause analyses than those provided by unidentified face-to-face informants. Although this necessarily remains a case-by-case evaluation, taking together the considerations set forth in *Henness* and the totality of the circumstances in this case, we cannot avoid the conclusion that the informant's tip here was entitled to more weight than the district court gave it.

9

**B. The Allegation of Illegality**

The second error in the district court's analysis stems from its conclusion that the tip failed to allege that Williams was engaged in illegal conduct. Specifically, the magistrate judge concluded that "[g]iven the increased instances in Michigan of individuals being given permits to carry concealed weapons one cannot conclude that carrying a handgun in a car is likely to be against the law." R. 37 (Report & Recommendation at 7). As we observed in *United States v. Galaviz*, 645 F.3d at 356, however, Michigan law in fact compels the opposite conclusion. Michigan statutes make it a crime to carry a pistol "concealed or otherwise, in a vehicle operated or occupied by" the carrier. Mich. Comp. Laws § 750.227(2). Additionally, the individual has the burden of demonstrating that he has a license to carry the pistol. Mich. Comp. Laws § 776.20. As a result of this statutory structure, merely showing that a defendant carried a pistol in a vehicle he owns or operates establishes a prima facie violation of state law; at that point, it is up to the defendant to raise the issue of licensure and offer proof that his possession was lawful. *People v. Henderson*, 218 N.W.2d 2, 4 (Mich. 1974).

Applying these provisions in *Galaviz*, we determined that because Michigan law prohibits carrying a handgun in a vehicle without a license and because the burden of establishing the license is on a defendant, the incriminating nature of a gun in plain view in the vehicle was "immediately apparent" for purposes of establishing probable cause under the plain-view exception. *Galaviz*, 645 F.3d at 356. Along similar lines, we also determined that merely viewing the gun in the car gave officers probable cause to conduct a warrantless search under the automobile exception. *Id.* at 357; *cf. Adams v. Williams*, 407 U.S. 143, 160 & n.9 (1972) (Marshall, J., dissenting) (implying that gun possession would be a relevant factor in the probable-cause determination only if state law made

such possession illegal). Based on this precedent, we believe that the informant's tip that the driver of the Cadillac was in possession of a handgun amounted to an allegation that the driver was engaged in illegal conduct, especially for purposes of the lesser reasonable-suspicion standard.

## C. Application

Reweighing the facts in light of *Henness* and *Galaviz*, we hold that the officers had reasonable suspicion to support Williams's stop. Before receiving the tip, officers had only two facts in their favor: (1) the blue Cadillac had been observed traveling to and from a street that was known to be a high-crime area with a substantial amount of gang violence and a high number of drug transactions; and (2) the blue Cadillac and gray Impala had been observed entering and exiting the area simultaneously, leading officers to believe they were associated with one another.[1] These alone likely could not establish reasonable suspicion. It was therefore the Impala driver's face-to-face tip—which both connected the Cadillac to the one Watson observed on Woodall and made a specific assertion of illegality—that changed the calculus. The tip informed officers that the driver of the blue Cadillac, who was in close proximity to the area, was then in possession of a specific-caliber firearm and that the driver intended to sell it. Because that information contained greater indicia of

---

[1]Williams tries further to undercut the officers' actions by noting that there was no evidence that Wright, who conducted the stop, knew of Watson's earlier observations of the Cadillac and Impala on Woodhall. The record fails to support this assertion. Indeed, during the suppression hearing, Wright recalled having heard police radio transmissions concerning a possible association between the Cadillac and the Impala based on their presence in and departure from the same area at the same time, and the record as a whole supports substantial communication between the officers on the task force. That being the case, this court may consider the collective knowledge of the officers in evaluating whether they had reasonable suspicion at the time of the stop. *United States v. Braggs*, 23 F.3d 1047, 1049 (6th Cir.), *cert. denied*, 513 U.S. 907 (1994). Thus, contrary to Williams's assertions otherwise, this case is not akin to the situation in *United States v. Blair*, 524 F.3d 740, 751–52 (6th Cir. 2008), in which the officer who conducted the *Terry* stop could not feasibly have been aware of information essential to the reasonable-suspicion determination at the time he effected the stop.

reliability than the district court gave it credit, the tip, in concert with the other facts known to officers before they made the stop, gave rise to reasonable suspicion. Accordingly, the district court's suppression order was in error.

### III. CONCLUSION

Because the district court's evaluation of the informant's tip conflicts with our recent precedents in *Henness* and *Galaviz*, and because the application of those cases leads to the conclusion that, based on the totality of the circumstances, the officers had reasonable suspicion to support Williams's stop, we **REVERSE** the district court's judgment and **REMAND** for further proceedings consistent with this opinion.