**[J-22-2025] [MO: Dougherty, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 12 WAP 2024 |
| | : | |
| Appellee | : | Appeal from the Order of the |
| | : | Superior Court entered July 17, |
| | : | 2023, at No. 619 WDA 2022, |
| v. | : | affirming the Judgment of Sentence |
| | : | of the Court of Common Pleas of |
| | : | Allegheny County entered January |
| JAMAR FOSTER, | : | 5, 2022, at No. CP-02-CR-0013992- |
| | : | 2019 |
| Appellant | : | |
| | : | ARGUED:  April 9, 2025 |

**DISSENTING OPINION**

**JUSTICE DONOHUE**                                      **DECIDED: MAY 18, 2026**

This Court decided to answer the question of whether "the Superior Court erred in affording too much weight" to Jamar Foster's "temporal and spatial proximity to a ShotSpotter alert in assessing whether reasonable suspicion existed to support a *Terry*[1] stop[,]" a matter implicating the impact of an emerging technology on our search and seizure jurisprudence.  *Commonwealth v. Foster*, 316 A.3d 619 (Pa. 2024) (*per curiam*). The Majority avoids that important question by treating Foster's temporal and spatial proximity to the ShotSpotter alert as but one of several factors supporting the trial court's conclusion that police possessed reasonable suspicion to detain him.  Consequently, the error review engaged in by the Majority does little if anything to aid the bench and bar in resolving future cases involving ShotSpotter.  Worse, the Majority muddles the reasonable suspicion standard with leaps of logic unjustified by the record before us.  With

---

[1]  *Terry v. Ohio*, 392 U.S. 1 (1968).

the clutter of irrelevant factors removed from the analysis, I would hold that Foster's temporal and spatial proximity to the ShotSpotter alert is alone insufficient to support a finding of reasonable suspicion. Accordingly, I respectfully dissent.

At approximately 2 a.m. on a September morning in 2019, ShotSpotter indicated possible gunfire near 1439 Hoffman Street in the Manchester neighborhood of Pittsburgh's North Side, a population-dense residential neighborhood. N.T., 10/1/2020, at 4-5. On his way to investigate, Pittsburgh Police Officer Nathan Powers received a second indication from ShotSpotter of additional shots detected at the same location. *Id*. at 6. No more than 15 seconds after the second ShotSpotter notification, Officer Powers observed a black sedan near 1439 Hoffman Street, parked against the flow of traffic with its headlights on. *Id*. Foster was initially seated in the driver's seat, and the passenger seat was occupied by Tiffany Towns. *Id*. at 7-8. Officer Powers did not observe any other people on the block at that time. *Id*. at 6-7. He activated his emergency lights after he saw Foster exit his vehicle and walk toward a house.[2] Officer Powers also observed that

---

[2] The Majority incorrectly implies that Foster began walking away after Officer Powers turned on his emergency lights. Majority Op. at 13 ("After observing the car, the officer turned his police cruiser from Chateau Street onto Hoffman Street and activated his lights and dash camera. As he drove on Hoffman Street in the direction of the parked car, Officer Powers saw [Foster] exit the car and walk towards a private residence … ."). The Majority based this conclusion on Officer Powers' direct examination testimony during which he stated that he activated his "lights and [his] camera system **to detain the individuals in the car**." N.T., 10/1/2020, at 7 (emphasis added). During cross examination, Officer Powers clarified that although Foster was in the vehicle when the officer first saw him, Foster had already exited and begun walking away when the Officer Powers turned on his emergency lights:

> A. When I first saw him, he was in the driver's seat.
>
> Q. Okay.
>
> A. **When I turned down the street and turned on the lights, he <u>was</u> walking away**.

(continued…)

Towns was "moving around in the car trying to grab things, grab, like, her purse." *Id*. at 8.  After bringing his vehicle to a stop across the street from and facing Foster's vehicle, Officer Powers ordered Foster to stop and return to the street.  *Id*. at 7.

The Majority determined that Foster was subject to a *Terry* Stop when Officer Powers ordered him to stop.  Majority Op. at 13-14.  I agree only insofar as the detention could not have occurred any later.[3]  It has long been the law in Pennsylvania that when a police officer verbally orders a citizen to stop moving, a constitutionally significant event has occurred that triggers scrutiny under the Fourth Amendment.  *Commonwealth v. Jones*, 378 A.2d 835, 839 (Pa. 1977) ("If a citizen approached by a police officer is ordered to stop or is physically restrained, obviously a 'stop' occurs.").  With that

---

Q. So he was walking away as you are making the right-hand turn, and you are leaning to see the vehicle sitting where it was?

A. Correct.

N.T., 10/1/2020, at 14 (emphasis added).

The Majority defends its version of the order of events by stating that there is a "conflict in the testimony" that must be "resolved in the Commonwealth's favor as the prevailing party at the suppression hearing[.]"  Majority Op. at 13 n.9.  The only conflict here is between Officer Powers' unambiguous answer during cross-examination—that Foster began walking away before the emergency lights were activated—and an inference drawn solely from Officer Powers' earlier vague testimony.

This was not a situation where two witnesses came to different conclusions about the same event, nor where a witness gave two incompatible answers to the same question that remained unresolved on the record.  Here, Officer Powers' initial testimony was less than clear but his subsequent testimony fully resolved any ambiguity.  When redirect examination occurred moments later, the assistant district attorney did not revisit the order of events.  *See* N.T., 10/1/2020, at 20-21.

[3]  In my view, there were no significant facts that arose between the time Officer Powers activated his lights and the moment he ordered Foster to stop that affect my view of the constitutionality of the stop.

established, I turn to examine each of the factors cited by the Majority to support its determination that Officer Powers possessed reasonable suspicion to conduct that stop.

"In order to demonstrate reasonable suspicion, the police officer must be able to point to specific and articulable facts and reasonable inferences drawn from those facts in light of the officer's experience." *Commonwealth v. Cook*, 735 A.2d 673, 677 (Pa. 1999). We assess those facts and reasonable inferences derived therefrom holistically such that otherwise innocent-appearing facts may justify temporary detention under the totality of the circumstances. *Commonwealth v. Rogers*, 849 A.2d 1185, 1189 (Pa. 2004).

When assessing the reasonableness of an officer's suspicion of criminal activity under the totality-of-the-circumstances, we remain cognizant that both our state and federal constitutions demand that the suspicion is both reasonably derived from articulable facts and particularized to the person seized. *See id.* ("A police officer may detain an individual in order to conduct an investigation if that officer **reasonably** suspects that **the individual** is engaging in criminal conduct.") (citing *Cook*, 735 A.2d at 676) (emphasis added); *accord United States v. Cortez*, 449 U.S. 411, 417–18 (1981). As the *Cortez* Court explained, "an assessment of the whole picture must yield a particularized suspicion" to justify a stop because requiring such specificity is the "central teaching" of the High Court's Fourth Amendment jurisprudence. *Cortez*, 449 U.S. at 418 (citing *Terry*, 392 U.S. at 21 n.18).

Aside from circumstances related to the ShotSpotter reports, the Majority first considered, but ultimately rejected, the purportedly high-crime nature of the location where Foster was seized. Majority Op. at 15-16. In the context of this Fourth Amendment challenge, I agree with that aspect of the Majority's analysis. As I have consistently maintained, "the characteristic of a neighborhood as being … disproportionately crime-ridden" is a fact that "the Commonwealth bears the burden of proving" through "objective

evidence." *Commonwealth v. Lewis*, 343 A.3d 1016, 1059 (Pa. 2025) (Donohue, J., dissenting) (quoting *Commonwealth v. Jackson*, 302 A.3d 737, 757 (Pa. 2023) (Donohue, J., opinion in support of reversal)). Furthermore, even if the Commonwealth can supply proof that a specific area is disproportionally affected by a particular type of crime, the Commonwealth must also demonstrate that such evidence "is relevant to the officer's suspicions." *Id*. at 758. Here, as explained by the Majority, Officer Powers' "bare testimony claiming the area was a 'hot spot' at some undefined time 'in the past' does not equate to evidence the area was a high-crime area at the time of the seizure." Majority Op. at 15. I add only that there was also no testimony demonstrating how the character of the neighborhood buttressed the officer's suspicion that Foster was involved in criminal activity.[4] Thus, the Majority correctly disregarded the purportedly high-crime nature of the area in which Foster was detained.

Albeit with negligible analysis, the Majority next considers two factors unrelated to ShotSpotter to support a finding of reasonable suspicion to stop Foster: Towns' "furtive movements in the front seat of the car[,]" and Foster's walking away from Officer Powers. Majority Op. at 18-19. Towns' movements would implicate Towns first and foremost, and this case does not concern whether Officer Powers possessed reasonable suspicion to detain her. However, there is no need to struggle with whether Towns' behavior contributed to reasonable suspicion to detain Foster because there was simply nothing objectively suspicious about her behavior to consider. Officer Powers never testified that Towns had engaged in furtive movements, nor did he mention her behavior as a basis for

---

[4] In her concurring opinion, Justice Mundy contends that Officer Powers' testimony was "sufficient to establish that the area was a high-crime area" and that in any event, Foster "admitted that the seizure took place in a high[-]crime area." Concurring Op. at 3. Assuming for the sake of argument that Justice Mundy is correct, Officer Powers never explained the relevance of such a fact to his suspicion that Foster was involved in criminal activity. Thus, the purportedly high-crime nature of the neighborhood remains irrelevant to our analysis regardless of Foster's admission.

his suspicion of Foster.  Tellingly, the suppression court never cited Towns' behavior as a contributing factor.

A "furtive gesture" is a "surreptitious movement, esp. one seeming to be hiding something, seen by a police officer and providing reasonable suspicion to detain or search."  *Furtive Gesture*, BLACK'S LAW DICTIONARY (12th ed. 2024); *see also Furtive*, WEBSTER'S II DICTIONARY, 292 (3d ed. 2005) ("1. Stealthy : surreptitious.  2.  Shifty : sly.").  As Black's Law Dictionary hints, "furtive" has become a term of art (or, less charitably, magic words) used to describe an attempt to secrete or obscure possible evidence of a crime during an interaction with police.  Critically, Officer Powers never used the term "furtive" during his testimony, nor did he describe furtive conduct.  Instead, Officer Powers matter-of-factly stated: "[T]here was a female passenger in the front passenger seat. She looked like she was moving around in the car trying to grab things, grab, like, her purse."  N.T., 10/1/2020, at 8.  Officer Powers' testimony did not suggest an attempt to hide or obscure evidence.   Furthermore, grabbing a purse before departing a vehicle is innocuous; it is neither stealthy, surreptitious, shifty, nor sly.  Nor can we ignore that Officer Powers never articulated that Towns' movements had elevated his suspicion of Foster.

The record shows that the prosecutor first added a "furtive" connotation to Officer Powers' testimony during argument before the suppression court.  *Id*. at 27 ("[Officer Powers] also stated that one of the individuals in the car was rustling around **and putting something into her purse**.") (emphasis added).  The arguments of counsel are not facts and, as the record plainly shows, Officer Powers never said that Towns put anything into her purse, and the trial court made no mention of Towns' movements at all in denying

suppression.[5]   Likewise, the Superior Court did not mention Towns' behavior as a contributing factor in its reasonable suspicion analysis.  *Commonwealth v. Foster*, 619 WDA 2022, 2023 WL 4557061, at *3-*7 (Pa. Super. July 17, 2023) (non-precedential decision).  For these reasons, I disagree with the Majority's reliance on Towns' behavior to justify Foster's detention.[6]  There is nothing suspicious about a woman grabbing for her purse as she prepares to exit a car.[7]

---

[5]  The late Judge David Cashman presided over the suppression hearing and bench trial but retired soon thereafter.  This case was reassigned to the Honorable Judge Elliot Howsie, Jr., who authored the Pa.R.A.P. 1925(a) opinion.  Trial Court Opinion, 7/19/2022, at 1.  Judge Cashman never issued findings of fact following the suppression hearing.  However, the transcript of that proceeding reveals no reliance by Judge Cashman on Towns' movements as a basis to deny Foster's suppression motion.  *See* N.T., 10/1/2020, at 28-30.

[6]  To its credit, the Commonwealth does not repeat before this Court the prosecutor's misrepresentation at the suppression hearing of Officer Powers' testimony regarding Towns' movements. *See* Commonwealth's Brief at 14 n.8 (stating "the female passenger was observed moving around in the front seat of the sedan, grabbing things"). Nonetheless, it continues to maintain that it was suspicious behavior despite the facts that 1) Officer Powers never described it as such, and 2) Officer Powers never articulated that it contributed to his decision to detain Foster.

[7]  The Majority insists that its reliance on Towns' movements is appropriate, citing the inapposite circumstances of *District of Columbia v. R.W.,* 608 U.S. ___, 2026 WL 1052344 (2026) (*per curiam*).  In *R.W.*, police responded to a report of a suspicious vehicle and, when they found it in a parking lot, "two people fled from the car … unprovoked," leaving "at least one of the car doors" open as they fled.  *R.W.*, 2026 WL 1052344 at *1.  The driver then attempted to drive away from the approaching police with the rear door still open, at which point police ordered him to stop.  *Id*.  The Supreme Court determined that it "need not determine whether" a connection between the fleeing individuals and R.W., the driver, "alone supported reasonable suspicion because R.W. was in the driver's seat and—after the passengers fled from the car—[he] began backing out of the parking space, ignoring the car's open back door."  *Id*. at *2.  Obviously police should stop a vehicle that is moving with an open door, which is far more suspicious behavior than a woman reaching for her purse.  Moreover, Foster began **walking** away before Officer Powers activated his emergency lights, which is entirely unlike the headlong flight of the individuals in *R.W. R.W.* presents a set of disanalogous facts warranting a distinct analysis that is not applicable here.

(continued…)

There is also no support in the record for the Majority's reliance on Foster's "evasive" behavior. As explained above, Foster was already walking away from his vehicle when Officer Powers activated his lights. *See supra* n.2. Regardless, there was no evidence of his evasive behavior before he was ordered to stop.

Flight from police cannot alone demonstrate reasonable suspicion. *Cook*, 735 A.2d at 677 (citing *Commonwealth v. Matos*, 672 A.2d 769 (Pa. 1996)). However, it may contribute with other factors to justify a stop because "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). In *Wardlow*, the detainee demonstrated nervous and evasive behavior when he engaged in "[h]eadlong flight," which the High Court described as "the consummate act of evasion" in that, although not "necessarily indicative of wrongdoing," it is "certainly suggestive of such." *Id*.

Here, Officer Powers merely observed Foster exiting his parked car and walking toward a nearby residence. It strains credulity to treat such behavior as akin to flight, much less the "headlong" flight described in *Wardlow*.[8] Foster was doing precisely what we would expect a driver to do after he parks his car in front of a residential building at 2

---

The Majority also disregards Officer Powers' actual observations to come to its own conclusion that Towns was engaged in "furtive" conduct. It justifies its conclusion under the auspices of analyzing the objective reasonableness of Officer Powers' decision to detain Foster irrespective of his subjective reason for doing so. *See* MO at 18 n.17. However, the Majority is really engaging in appellate factfinding from a cold record as its finding that Towns engaged in evasive behavior is conspicuously absent from the trial court's Pa.R.A.P. 1925(a) opinion. Indeed, Judge Howsie made no mention of Towns' behavior at all in explaining why suppression was denied. *See* Trial Court Opinion, 7/19/2022, at 1-2, 4-5. Moreover, Judge Cashman made no mention of Towns' movements when he reached his decision during the suppression hearing. *See* N.T., 10/1/2020, at 24-30. The reason for those omissions is simple: Officer Powers did not observe furtive movements by Towns.

[8] Flight in this context means "fleeing." *Flight*, WEBSTER'S II DICTIONARY, 274 (3d ed. 2005). "Headlong" means "[a]t breakneck speed" or "rashly : impetuously." *Headlong*, WEBSTER'S II DICTIONARY, 331 (3d ed. 2005).

a.m., and there was no evidence tending to show that Foster walked away in response to the arrival of police. It was only after Officer Powers ordered Foster to stop that Foster engaged in behavior fairly described as evasive. *Compare* N.T., 10/1/2020, at 7 ("I observed a black male leave the driver's seat and walk towards a private residence. That's when I ordered the male to return to the street so we could conduct an investigation."), *with id*. at 8 ("The defendant refused to comply with the officers and continued to walk away, at which point we feared that he was armed, having the ShotSpotter notification, and then walking away. We drew our guns and ordered him at gunpoint, at which point he finally got down on the ground, and we had to forcefully handcuff him to get him under compliance."). Because Foster's only "evasive" behavior occurred after he was ordered to stop, it cannot be used to retroactively justify the stop that preceded it. Thus, I disagree with the Majority that Foster engaged in any type of evasive behavior prior to Officer Powers' order to stop.[9]

For these reasons, I believe the only circumstances relevant to this Court's reasonable suspicion analysis were Foster's temporal and spatial proximity to a ShotSpotter alert. The posture of this case does not allow us to examine the accuracy

---

[9] The Superior Court has held that when an individual walks away upon the arrival of police, even in conjunction with other facts, such behavior does not support a finding reasonable suspicion. *In re J.G.*, 860 A.2d 185, 189 (Pa. Super. 2004) (holding no reasonable suspicion when suspect walked away from arriving police in a high-crime area); *see also Commonwealth v. Martinez*, 588 A.2d 513, 516 (Pa. Super. 1991) (holding reasonable suspicion did not arise when, as police arrived on the scene just after midnight, Martinez "walked quickly away" while grabbing at a bulge in her coat); *and see Commonwealth v. Washington*, 51 A.3d 895, 898-99 (Pa. Super. 2012) (distinguishing *Wardlow* in holding that flight is only a relevant factor when evidence demonstrates the individual "knew he was running from the police"). Here, not only was Foster only walking away from his parked car, he began walking away before Officer Powers activated his emergency lights and long before he was ordered to stop.

and reliability of ShotSpotter as Foster and Amici would like us to do,[10] as the question presented for our review does not clearly encompass it and there was no evidence presented at the suppression hearing regarding ShotSpotter's reliability in detecting gunshots. Thus, I believe that in considering whether Officer Power's testimony established reasonable suspicion to detain Foster, we must assume that ShotSpotter twice detected actual gunshots.[11] I also accept the Majority's assumption that the occurrence of gunshots in the circumstances of this case was fairly "suggestive of criminal activity." Majority Op. at 16-17. Thus, from my perspective, this case is not about whether Officer Powers reasonably suspected that a crime occurred (he did), but instead it is about whether the officer had a reasonable and particularized suspicion that established a nexus between Foster and the suspected crime. I believe the Commonwealth failed to establish that nexus on this record.

---

[10] As explained by the Majority, the Pennsylvania Innocence Project, the Pennsylvania Association of Criminal Defense Lawyers, the American Civil Liberties Union, and the Allegheny County Public Defender's Office join Foster in contending that "ShotSpotter is a faulty method for detecting gunfire." Majority Op. at 8.

[11] By assuming that ShotSpotter detected actual gunshots, there is no need to debate whether to apply an anonymous-tip framework of analysis. The Sixth Circuit has aptly explained:

> On the one hand, tips from anonymous informants are generally entitled to little weight because they provide slim, if any, opportunity to assess the reliability and credibility of the individual providing the information. Thus, unlike known or identified informants, anonymous tipsters, without more, cannot be deemed reliable regarding their allegations.

*United States v. Williams*, 483 Fed.Appx. 21, 25 (6th Cir. 2012) (citations, quotation marks, and brackets omitted). Here, by putting aside questions of ShotSpotter's accuracy or reliability in detecting gunshots, we can focus our attention on providing a framework of analysis for examining evidence pertaining to an individual's spatial and temporal proximity to a ShotSpotter alert.

It is logical that such a nexus might be established when an individual is found in the immediate spatial and temporal proximity to the known location of a gunshot, which is the fundamental inferential premise of the Majority's Opinion.[12]  The direct corollary inference that flows from that logic is that the nexus becomes increasingly tenuous over time and distance from the gunshot's location.  I add that the weight to be afforded to spatial and temporal proximity may also be dependent on the character of the space in which an individual is found.  For example, an individual found alone in the middle of field soon after a gunshot was fired there is very likely to have fired it.  By contrast, if a shot is fired in the middle of a densely crowded space like a concert venue, it would be far more unlikely that any specific individual was culpable based solely on spatial and temporal proximity to the shot.  With these principles in mind, I believe the Majority substantially overstates Foster's spatial and temporal proximity to the ShotSpotter alerts.

First, the Majority embellishes the temporal nexus when it states that Officer Powers "promptly arrived on the scene within seconds of the second alert[.]"  Majority Op. at 18.  That is technically true, assuming Officer Powers' time estimate was accurate. *See* N.T., 10/1/2020, at 4-5 (testifying that he arrived at the scene ten to fifteen seconds after the second ShotSpotter notification); *but see id.* at 11-12 (testifying during cross examination, in response to virtually the same question of how much time elapsed between the second ShotSpotter alert and his arrival on the scene, that he "would have to refer to [his] body camera or dash cam" to provide an accurate estimate).  However, the Majority's statement of that fact obscures that ShotSpotter notifications do not occur immediately after the system detects a shot, because it takes "approximately 30 to 45 seconds" for ShotSpotter to "determine if [the sound] was … a gunshot" or some similar

---

[12]  The Majority asserts that Foster and "Towns were the **only** individuals present **at the precise location** of the alerts … **immediately** on the heels of the gunshots[.]"  Majority Op. at 17 (emphasis added).

noise like a firework or a back-firing car. *Id*. at 5. Thus, Officer Powers observed Foster's vehicle at least forty to sixty seconds after the second round of shots were fired, but perhaps longer given that he later waffled on the time that elapsed from the second notification to when he first observed Foster and Towns. Forty to sixty seconds is plenty of time to flee the scene by foot and certainly by vehicle, and that is the minimum time that elapsed on this record.[13] That delay also provided plenty of time for a vehicle to arrive at the scene after the shots were fired.[14]

Second, the Majority also overstates Foster's spatial proximity to the gunshots. Officer Powers testified that ShotSpotter specified 1439 Hoffman Street as the location of the gunshots. But what does that mean? The Majority seems to presume the location of the shots corresponded with the front of the property line where it meets the street. *See* Majority Op. at 17 (stating that Foster and Towns were at the "precise location" of the ShotSpotter alerts). But the record does not support that assumption. Officer Powers admitted that, in his experience, shots are not always fired at the precise location given by ShotSpotter. N.T., 10/1/2020, at 6 (stating that ShotSpotter is accurate within 80-100

---

[13] The Majority maintains that sixty seconds "or less is undoubtedly a very prompt response time minimizing the possibility of the culprit's flight." MO at 18 n.16. I do not question that sixty seconds is a commendably short response time for police. However, the salient point is that sixty seconds is also ample time to depart from the scene of a crime by vehicle or by foot, with common sense dictating that criminals are unlikely to dawdle about for up to a minute after firing shots on a public street. The Majority also fails to explain why it insists on embellishing the record by claiming that Officer Powers arrived "within seconds of the second alert[,]" *see id*. at 18, when Officer Powers expressed uncertainty during cross-examination regarding his actual response time. *See* N.T., 10/1/2020, at 11 ("Q. How long did it take you to get from where you were when you received the notification to the address of the second set of ShotSpotters? A. I would have to refer to my body camera or dash cam for that."). The Commonwealth never presented Officer Powers' body cam footage into evidence at the suppression hearing.

[14] Indeed, the facts described by Officer Powers were consistent with an inference that Foster and Towns had just arrived; the vehicle was parked but its headlights were still on, Foster got out of the vehicle and walked toward a residence, and Towns' actions were consistent with her preparation to exit the vehicle.

feet). Thus, ShotSpotter may be off by over 30 yards when it returns an address. But where are those yards measured from? From the center point of the property at 1439 Hoffman Street? Or from the front of the property on Hoffman Street? Or from the back side of the property that intersects with different street or alley altogether?

This is not mere speculation on my part. Officer Powers admitted as much:

> Q. I believe you said on direct that it's not always at the specific location you respond to. Does that mean that on occasion when you respond to ShotSpotter there was not, in fact, activity at the location that you respond to?
>
> A. What I am referring to is that, for instance, this address is 1439, it may be at 1440 instead of 1439.
>
> Q. **Is it possible that ShotSpotter, that there may have been shots fired at the block next to 1439 Hoffman Street?**
>
> A. **You would have to talk to a technician about the accuracy of that.**
>
> Q. So the end result then is you think that the ShotSpotter came from 1439 Hoffman Street, but at the end of the day you can't say exactly where the shots fired occurred?
>
> A. We investigate the area around the address.
>
> Q. Right.
>
> A. So we use that as an investigatory tool and respond there.
>
> Q. And that's when you start an investigation?
>
> A. Correct.

N.T., 10/1/2020, at 10-11 (emphasis added).

Thus, Officer Powers candidly admitted that he could not dispel the possibility that shots were fired on a different block altogether, which greatly diminishes the weight

that should be afforded to his discovery of Foster in front of 1439 Hoffman Street.[15]  It also diminishes the impact of his testimony regarding the absence of other people or vehicles at 1439 Hoffman Street, particularly since Officer Powers did not testify to the absence of people or vehicles on neighboring blocks.

These limitations of ShotSpotter's locational accuracy are particularly relevant given the nature of the setting in which these events unfolded—a densely populated urban neighborhood.  Numerous other houses fell within range of where Officer Powers admitted that shots could have been fired, given his knowledge and experience with ShotSpotter.  Furthermore, not only did those other homes provide a potential source for the gunshots, they also provided cover for any fleeing shooter even assuming the shots were accurately detected at 1439 Hoffman Street.

In sum, I believe the Majority erroneously relies on the purported suspiciousness of Towns' and Foster's observed behavior that is directly at odds with Officer Powers' actual testimony.  With those unsupported inferences set aside, the only evidence supporting Foster's temporary detention was that related to his spatial and temporal proximity to the location provided to Officer Powers by ShotSpotter.  As detailed above, that evidence was far less compelling than suggested by the Majority's cursory analysis of an underwhelming factual record.  Critically, the evidence fell short of providing adequate individualized suspicion that Foster was responsible for the gunshots detected by ShotSpotter.  For these reasons, I would reverse the Superior Court's decision that affirmed the denial of Foster's suppression motion.

---

[15]  The Majority responds by suggesting that I am demanding "scientific certainty" by pointing out the technical limitations of ShotSpotter established by the Commonwealth's witness.  Majority Op. at 17 n.15 (quoting *Lewis*, 343 A.3d at 1038).  To the contrary, it is the Majority that insinuates scientific certainty by emphasizing that Foster and Towns were the only people "present at the **precise location** of the alerts." *Id*. at 17 (emphasis added).  Thus, the Majority gives undue weight Foster's spatial proximity to the location indicated by ShotSpotter by exaggerating the accuracy of the alert.

I respectfully dissent.